## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INTERNATIONAL RIGHTS ADVOCATES,<br>621 Maryland Ave, NE, Washington, DC 20002<br><br>Plaintiff,<br><br>V.<br><br>TESLA, INC.,<br>1 Tesla Road, Austin, TX 78725<br><br>Defendant. | Civil Action No. _____ |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that Defendant Tesla, Inc. ("Tesla"), pursuant to 28 U.S.C. §§ 1332(a), 1441(a)–(b), and 1446, hereby removes the above-captioned action from the Superior Court of the District of Columbia, Civil Division, to the United States District Court for the District of Columbia. In support of removal, Tesla provides this short and plain statement of the grounds for removal. 28 U.S.C. § 1446(a).

## BACKGROUND

1.  On August 19, 2025, International Rights Advocates ("IRA") filed a complaint against Tesla in the Superior Court of the District of Columbia under Case No. 2025-CAB-005515 ("Complaint").

2.  IRA perfected service on Tesla on September 15, 2025.

3.  Plaintiff brings this action under the District of Columbia's Consumer Protection Procedures Act (the "CPPA"), D.C. Code § 28-3901, *et seq.*

4.  Plaintiff claims that Tesla has violated the CPPA by making allegedly false or misleading representations relating to human rights, labor practices, and environmental sustainability in its supply chain. *See* Compl. ¶¶ 2–9, 111–16.

5.      IRA alleges that it brings this action "on behalf of the general public of the District of Columbia, which comprises District of Columbia consumers." Compl. Preamble. IRA seeks declaratory and injunctive relief, an order granting IRA's "costs and disbursements, including reasonable attorneys' fees and expert fees, and prejudgment interest at the maximum rate allowable by law." Compl. at 33.

6.      Plaintiff is a citizen of the District of Columbia. Tesla is not a citizen of the District of Columbia.

## I.    This Court Has Jurisdiction Based on Diversity of Citizenship.

7.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a).

8.      District courts have jurisdiction over civil actions where (1) the parties are citizens of different states and (2) the amount in controversy exceeds the sum or value of $75,000. *Id.*

9.      Both requirements are met here.

### A.  IRA and Tesla Are Diverse.

10.     The citizenship of a corporation is based on the state in which a corporation is incorporated and the state where it has its principal place of business. 28 U.S.C. § 1332(c).

11.     Plaintiff IRA is a nonprofit organized under the laws of the District of Columbia and has its principal place of business in the District of Columbia.

12.     Defendant Tesla is incorporated in Texas and has its principal place of business in Texas.[1]

13.     Based on the foregoing, IRA is a citizen of the District of Columbia, and Tesla is not a citizen of the District of Columbia. Because Plaintiff has different citizenship from Defendant, there is complete diversity of citizenship for the purpose of 28 U.S.C. § 1332(a).

---

[1] The Complaint incorrectly alleges that Tesla is incorporated in Delaware. Tesla changed its state of incorporation to Texas in 2024.

**B.  The Amount in Controversy Exceeds $75,000.**

14.     As explained below, the attorneys' fees that IRA has requested are reasonably anticipated to exceed $75,000, and complying with the injunctive relief that IRA seeks is reasonably anticipated to exceed $75,000.

### 1.  IRA's Request for Attorneys' Fees Satisfies the Amount-in-Controversy.

15.     Because the CPPA permits a successful plaintiff to recover reasonable attorney's fees, *see* D.C. Code § 28-3905(k)(2)(B), Plaintiff's request for reasonable attorneys' fees counts towards the amount in controversy. *See Griffin v. Coastal Int'l Sec., Inc.*, No. 06-2246(CKK), 2007 WL 1601717, at *3 (D.D.C. Jun. 4, 2007) (recognizing request for attorneys' fees counts toward amount in controversy if "provided for by a . . . statute in controversy" (citation modified)). As explained below, the attorneys' fees that IRA has requested are reasonably anticipated to exceed $75,000.

16.     Plaintiff IRA is self-represented. The two attorneys who have appeared on behalf of IRA in this action are both employed by IRA. *See* Compl. at 33; Ex. 1 (excerpt of online bio of Terry Collingsworth); Ex. 2 (LinkedIn page for Olamide Abiose). Because Plaintiff's attorneys are employed by Plaintiff, IRA will receive 100% of any fee award. IRA "thus effectively seeks attorneys' fees for itself," setting it apart from "an ordinary member of the public[] with an indistinct interest in the outcome." *Int'l Rights Advocates v. Mars, Inc.*, No. 1:24-cv-894-RCL, 2025 WL 819580, at *8 (D.D.C. Mar. 13, 2025). Although courts in this district normally apply the "non-aggregation principle" (dividing the value of the requested relief by the beneficiary population) to calculate the jurisdictional amount in controversy, doing so would be inappropriate here because the award of attorneys' fees will accrue entirely to Plaintiff. *See, e.g., id.* at *8 (noting that IRA's "unusual posture of self-representation strikes the Court as potentially salient to the jurisdictional amount calculation" and lack of on-point authority, but declining to decide issue); *Zuckman v. Monster Beverage Corp.*, 958 F. Supp. 2d 293, 301 (D.D.C. Aug. 6, 2013) (declining

to apply non-aggregation principle to potential attorneys' fee award). No court in this district has directly addressed this issue. *Mars, Inc.*, 2025 WL 819580, at *7 (collecting cases).

17.    Tesla relies on the *Laffey* Matrix and the *Fitzpatrick* Matrix to determine whether the attorneys' fees sought by IRA are reasonably anticipated to exceed $75,000. The *Laffey* Matrix "is a fee schedule of hourly rates for attorneys practicing in the District of Columbia, broken down by years of experience." *Tenants of 710 Jefferson St. v. D.C. Rental Hous. Comm'n*, 123 A.3d 170, 182 (D.C. 2015). Both the D.C. court system and this Court have historically used the *Laffey* Matrix to determine whether attorneys' fees are reasonable. *See, e.g.*, *D.L. v. District of Columbia*, 924 F.3d 585, 589–90 (D.C. Cir. 2019); *Tenants of 710 Jefferson*, 123 A.3d at 186; *Covington v. District of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995). Its rates have been considered "presumptively reasonable," and "departure from [its] rates should not be lightly undertaken." *Tenants of 710 Jefferson*, 123 A.3d at 186.

18.    In addition, where the attorneys seeking fees work at an organization that "has no established rates," the *Laffey* Matrix has been recognized as "a very good place to start and . . . in most cases will be the best place to end" in determining appropriate attorneys' fees. *Id.* at 184.

19.    The *Fitzpatrick* Matrix is essentially an improvement on the *Laffey* Matrix promulgated by the U.S. Attorney's Office for the District of Columbia in 2021. *See J.T. v. District of Columbia*, 652 F. Supp. 3d 11, 31–32 (D.D.C. 2023). In recent years, lower courts in this District have substituted the *Fitzpatrick* Matrix for the *Laffey* Matrix. *See, e.g.*, *id.* However, we are not aware of any binding precedent affirming this substitution. We therefore have considered both matrices out of an abundance of caution.

20.    A recent version of the *Laffey* Matrix is attached as Exhibit 3. A recent version of the *Fitzpatrick* Matrix is attached as Exhibit 4.

21.    To apply the *Laffey* Matrix and the *Fitzpatrick* Matrix here, it is first necessary to determine the years of experience shared by IRA's counsel, Terrence Collingsworth and Olamide

Abiose. According to IRA's website, Mr. Collingsworth "has been practicing law in the United States for over 35 years," and "[f]or the last 25[ years], he has specialized in international human rights litigation." Ex. 1. According to her LinkedIn profile, Ms. Abiose graduated from Stanford Law School in 2023 and has been practicing law since October 2023 when she began working as an associate at Debevoise & Plimpton (before moving to International Rights Advocates in October 2024). Ex. 2.

22.     Pursuant to the *Laffey* Matrix and based on their self-described years of experience, Mr. Collingsworth's presumptive hourly rate is $1,141 per hour, and Ms. Aboise's presumptive hourly rate is $473 per hour.

23.     Pursuant to the *Fitzpatrick* Matrix and based on their self-described years of experience, Mr. Collingsworth's presumptive hourly rate is $933 per hour, and Ms. Aboise's presumptive hourly rate is $581 per hour.

24.     Applying the rates specified in the *Laffey* and *Fitzpatrick* Matrices, Mr. Collingsworth and Ms. Aboise would need to work between 66 hours (if Mr. Collingsworth did 100% of the work at the *Laffey* Matrix's $1,141/hour billable rate) and 159 hours (if Ms. Aboise did 100% of the work at the *Laffey* Matrix's $473/hour billable rate) for IRA's attorneys' fees claim to meet the amount-in-controversy requirement.[2] Applying the rates specified in the *Fitzpatrick* Matrix, Mr. Collingsworth and Ms. Aboise would need to work between 81 hours and 130 hours, depending on their division of labor.

25.     As stated in the declaration of Andrew Pollis attached hereto as Exhibit 6, Mr. Collingsworth and Ms. Aboise have likely already worked or will work the requisite number of

---

[2] In 2015, when Mr. Collingsworth was the managing partner of the Washington, D.C. office of Conrad & Scherer, LLP, his standard hourly rate was $550 per hour, according to an itemized calculation of costs & fees submitted by Mr. Collingsworth in a federal district court case November 16, 2014. *See* Ex. 5 (*Pandeosingh v. Am. Med. Response Inc., et al.*, No. 14-cv-01792-PAB (D. Col.), Dkt. No. 81-1), ¶¶ 11–12. Even if this Court were to use that outdated hourly rate in lieu of the *Laffey* Matrix, Mr. Collingsworth would need to work 137 hours in order for his fees to exceed $75,000.

hours to meet the amount-in-controversy requirement, through pre-filing investigation and research, drafting and filing the complaint, drafting and serving discovery requests, responding to Tesla's forthcoming motion to dismiss, and litigating a motion to remand (if IRA chooses to file one). *See, e.g.*, *In re Folgers Coffee, Mktg. Litig.*, 2021 WL 5106457, at *4 (W.D. Mo. Aug. 19, 2021) (finding in CCPA case "that it is certainly legally possible—perhaps even likely—that the attorneys' fees incurred in prosecuting this complex, fact-intensive case could, by themselves, exceed $75,000"); *see also Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 89 (2014) ("[A] defendant's notice of removal need include only a plausible allegation that the amount in controversy exceeds the jurisdictional threshold.").

26.     Plaintiffs routinely seek fees and have received fees that far exceed $75,000 in similar litigation. Moreover, courts in this District have awarded attorneys' fees of hundreds of thousands of dollars in cases brought under the CPPA. *See, e.g.*, *In re InPhonic, Inc.*, 674 F. Supp. 2d 273, 290 (D.D.C. 2009) (awarding $483,753.37 in fees and costs in action alleging, *inter alia*, violations of the CPPA); *Beck v. Test Masters Educ. Servs., Inc.*, 73 F. Supp. 3d 12, 20 (D.D.C. 2014) (awarding $854,623.90 in attorneys' fees to plaintiffs who won summary judgment on CPPA claim); *Williams v. First Gov. Mortg. and Investors Corp.*, 225 F.3d 738, 745-747 (D.C. Cir. 2000) (upholding $199,340 fee request in action alleging, *inter alia*, violations of the CPPA); *District Cablevision Ltd. P'ship v. Bassin*, 828 A.2d 714, 721, 733 (D.C. 2003) (upholding $425,916.25 attorneys' fee award for plaintiffs who won trial on CPPA claims); *Jackson v. Byrd*, 2004 WL 3249692, at *3 (D.C. Sup. Ct. Sept. 2, 2004) (awarding $196,000 in attorneys' fees in action alleging, *inter alia*, violations of the CPPA).

27.     Accordingly, IRA's request for attorneys' fees satisfies the amount in controversy.

## 2. IRA's Request for Injunctive Relief Also Satisfies the Amount-in-Controversy.

28.     It is well established that "an action seeking an injunction to protect or vindicate [] rights can meet the amount-in-controversy requirement." *GEO Specialty Chems., Inc. v. Husisian*,

951 F. Supp. 2d 32, 40 (D.D.C. 2013). To determine the amount in controversy when an injunction is sought, "[t]he Court 'may look either to the value of the right that plaintiff seeks to enforce or to protect[,] or to the cost to the defendants to remedy the alleged denial.'" *Id*. at 39 (quoting *Smith v. Washington*, 593 F.2d 1097, 1099 (D.C. Cir. 1978)). "Put another way, '[t]he value of injunctive relief for determining the amount in controversy can be calculated as the cost to the defendant.'" *Id*. at 39 (internal citations omitted) (quoting *Wexler v. United Air Lines, Inc.*, 496 F. Supp.2d 150, 153 (D.D.C. 2007)).

29.    IRA challenges statements made on the Tesla's websites, corporate policies, "product labeling," and/or other materials alleged to be accessible to consumers. *See* Compl. ¶¶ 38–110. IRA's requested injunction would require Tesla to eliminate those statements. Tesla would have to formulate new material to replace the challenged statements, identify each place the challenged statements appear, and adapt the new material to replace the challenged statements. That undertaking would require involvement of policy personnel, lawyers, communications and graphics vendors and specialists to create the new material, and information technology personnel to identify the material covered by the injunction. The cost to Tesla of complying with an injunction requiring such changes would exceed $75,000.

30.    Tesla acknowledges that courts in this District have routinely applied the "non-aggregation" principle when determining whether the cost to a defendant in implementing the requested relief satisfies the amount-in-controversy requirement. *See, e.g.*, *Mars, Inc.*, 2025 WL 819580, at *3–6, 9–10. Those courts have determined the amount in controversy by dividing the cost of compliance with the injunction sought by the number of beneficiaries of the injunction, which, in this case, would be the number of consumers in the District of Columbia. *See, e.g.*, *id*. There is, however, no controlling authority in this Circuit adopting this principle in the context of a single-plaintiff action where the party is self-represented, and Tesla submits that the non-binding authorities on this point are wrongly decided.

31.    The Court should refuse to apply the non-aggregation principle to Tesla's costs in implementing the requested relief. The basic rule is that "[i]n actions seeking declaratory or injunctive relief, . . . the amount in controversy is measured by the value of the object in litigation." *Hunt v. Wash. State Apple Adver. Comm'n*¸ 432 U.S. 333, 347 (1977). Thus, "[i]n assessing whether a complaint satisfies [the amount-in-controversy requirement], a court may look . . . to the cost to the defendant[] to remedy the alleged denial." *Bronner v. Duggan*, 962 F.3d 596, 610 (D.C. Cir. 2020) (internal quotations omitted). The D.C. Circuit has employed this test in the context of injunctive relief without dividing a defendant's cost by the number of beneficiaries of the requested relief. *See Comm. for GI Rts. v. Callaway*, 518 F.2d 466, 472 (D.C. Cir. 1975).

32.    Consistent with these decisions, other courts have similarly concluded that the non-aggregation principle does not apply where multiple plaintiffs sued a single defendant or a single plaintiff sued on behalf of a broader group. *See, e.g.*, *Williams v. Kleppe*, 539 F.2d 803, 804 n.1 (1st Cir. 1976); *Ronzio v. Denver & R.G.W.R Co.*, 116 F.2d 604, 606 (10th Cir. 1940); *In re Folgers Coffee, Mktg. Litig.*, 2021 WL 5106457, at *4; *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 702, 718-19 (D. Md. Jan. 12, 2001).

33.    So too here. Under the authorities discussed above, non-aggregation should not apply, and the amount in controversy exceeds the $75,000 jurisdictional threshold.

## II.    Tesla Has Complied with All Procedural Requirements for Removal.

34.    Tesla has satisfied the procedural requirements set forth in 28 U.S.C. § 1446.

35.    Tesla is filing this Notice of Removal pursuant to 28 U.S.C. §§ 1446 and 1441(a) in the United States District Court for the District of Columbia because the court where this action was commenced, the Superior Court of the District of Columbia, is within this federal judicial district and division.

36.    According to Plaintiff's Notice and Acknowledgement of Service form, Plaintiff delivered the Complaint to Tesla's registered agent on September 15, 2025. This Notice of

Removal is therefore timely because Tesla filed it within thirty days of the first day that Tesla received service. *See* 28 U.S.C. § 1446(b)(1).

37.     A copy of the Complaint, the Summons, all documents served upon Tesla, and a copy of the Superior Court Docket Report are attached hereto as Exhibits 7–12 pursuant to 28 U.S.C. § 1446(a). The Civil Cover Sheet is attached as Exhibit 13.

38.     Tesla will promptly serve the written Notice of Removal on IRA and will file a copy of this Notice with the Clerk of the D.C. Superior Court pursuant to 28 U.S.C. § 1446(d). Tesla intends to do so promptly after filing this Notice in federal court. A copy of the Superior Court Notice is attached as Exhibit 14.

39.     Tesla reserves all rights. Nothing herein should be construed as a waiver or relinquishment of any of Tesla's rights, defenses, or remedies.

Dated: October 14, 2025                    Respectfully submitted,

                                           By: */s/David Horniak*
                                           Mary Gately (# 419151)
                                           David Horniak (# 998649)
                                           **DLA PIPER LLP (US)**
                                           500 8th Street, N.W.
                                           Washington, DC 20004
                                           (202) 799-4361
                                           mary.gately@us.dlapiper.com
                                           david.horniak@us.dlapiper.com
                                           *Counsel for Defendant Tesla, Inc.*

# EXHIBIT 1



# Terry Collingsworth

Terry Collingsworth, the Founder and Executive Director of IRAdvocates, has been practicing law in the United States for over 35 years. For the last 25, he has specialized in international human rights litigation. He was General Counsel of the International Labor Rights Forum (ILRF) from 1989 to 2006. He was made Executive Director of the ILRF on September 1, 2001.

In April 2007, Terry decided to focus primarily on human rights and left the ILRF to establish and head IRAdvocates. He has litigated cases worldwide and uses his legal experience and extensive international network to bring lawyers, educators, and human rights activists together to collaborate on strategic litigation, public policy, consumer campaigns, and targeted actions.

In his early years, Terry was an overhead crane operator at a Cleveland, Ohio copper mill for five years while he attended college part-time at Lakeland Community College and Cleveland State University, from which he graduated *summa cum laude*. He then attended Duke University School of Law and graduated as a member of the Order of the Coif. He has taught at numerous law schools in the United States and has

# EXHIBIT 2



## Olamide A. 🛡 She/Her · 3rd

Fellow at International Rights Advocates


● Stanford University

San Francisco, California, United States · Contact info

500+ connections

Message     + Follow     More

---

### Activity

815 followers

Olamide A. commented on a post • 3d

Was wonderful to meet you and commiserate at the end of the conference! Look forward to connecting at future conferences 😄

---

Olamide A. commented on a post • 11mo

Ahh congratulations!!

---

Show all comments →

---

### Experience



**Fellow**
International Rights Advocates · Full-time
Oct 2024 - Present · 1 yr 1 mo
District of Columbia, United States · Remote



**Associate**
Debevoise & Plimpton · Full-time
Oct 2023 - Oct 2024 · 1 yr 1 mo
San Francisco, California, United States · On-site



**Graduate Researcher**
Stanford University School of Medicine · Full-time
Sep 2018 - Dec 2023 · 5 yrs 4 mos

**Summer Associate**
Hillspire · Full-time
Jun 2021 - Aug 2021 · 3 mos
Menlo Park, California, United States · Remote



**Litigation Intern**
SPACES FOR CHANGE · Full-time
Jun 2019 - Aug 2019 · 3 mos
Lagos, Lagos State, Nigeria · On-site

Show all 9 experiences →

## Education



**Stanford University**
Doctor of Philosophy - PhD, Neuroscience
Aug 2018 - Dec 2023

Activities and societies: Diversifying Academia, Recruiting Excellence (DARE) Fellow; Mind, Brain, Computation, and Technology (MBCT) Student Progra...



**Stanford University**
Doctor of Law - JD
Aug 2017 - Jun 2023

Activities and societies: Stanford Law Review (Articles Editor); Community Law Clinic; Black Law Students Association (Co-President); Stanford Journal...

Show all 4 educations →

## Skills

**Public Speaking**

 Endorsed by Chris Thompson and 4 others who are highly skilled at this

 21 endorsements

**Adobe Illustrator**

Show all 21 skills →

## Publications

**Post-translational modifications linked to preclinical Alzheimer's disease-related pathological and cognitive changes**
Alzheimer's & Dementia · Dec 25, 2023

Show publication ⧉

Abiose, O., Rutledge, J., Moran-Losada, P., Belloy, M.E., Wilson, E.N., He, Z., Trelle, A.N., Channappa, D., Romero, A., Park, J., Yutsis, M.V., Sha, S.J., Andreasson, K.I., Poston,...

## Honors & awards

**Pro Bono Distinction**
Jun 2023

 Associated with Stanford University

**Human Amyloid Imaging Travel Award**
Jan 2023

 Associated with Stanford University

Show all 8 honors & awards →

## Interests

Companies    Groups    Schools



Harvard Graduate School of Education
134,565 followers

\+ Follow

Stanford University School of Medicine
275,082 followers

\+ Follow

Show all companies →

## Causes

Children • Civil Rights and Social Action • Human Rights • Health • Politics • Science and Technology • Poverty Alleviation • Education • Economic Empowerment • Environment • Disaster and Humanitarian Relief • Social Services

# EXHIBIT 3

# LAFFEY MATRIX

History

Case Law

See the Matrix

Contact us

Home

| Year | Adjustmt Factor** | Paralegal/ Law Clerk | Years Out of Law School * | | | | |
|---|---|---|---|---|---|---|---|
| | | | 1-3 | 4-7 | 8-10 | 11-19 | 20 + |
| 6/01/24- 5/31/25 | 1.080182 | $258 | $473 | $581 | $839 | $948 | $1141 |
| 6/01/23- 5/31/24 | 1.059295 | $239 | $437 | $538 | $777 | $878 | $1057 |
| 6/01/22- 5/31/23 | 1.085091 | $225 | $413 | $508 | $733 | $829 | $997 |
| 6/01/21- 5/31/22 | 1.006053 | $208 | $381 | $468 | $676 | $764 | $919 |
| 6/01/20- 5/31/21 | 1.015894 | $206 | $378 | $465 | $672 | $759 | $914 |
| 6/01/19- 5/31/20 | 1.0049 | $203 | $372 | $458 | $661 | $747 | $899 |
| 6/01/18- 5/31/19 | 1.0350 | $202 | $371 | $455 | $658 | $742 | $894 |
| 6/01/17- 5/31/18 | 1.0463 | $196 | $359 | $440 | $636 | $717 | $864 |
| 6/01/16- 5/31/17 | 1.0369 | $187 | $343 | $421 | $608 | $685 | $826 |
| 6/01/15- 5/31/16 | 1.0089 | $180 | $331 | $406 | $586 | $661 | $796 |
| 6/01/14- 5/31/15 | 1.0235 | $179 | $328 | $402 | $581 | $655 | $789 |
| 6/01/13- 5/31/14 | 1.0244 | $175 | $320 | $393 | $567 | $640 | $771 |
| 6/01/12- 5/31/13 | 1.0258 | $170 | $312 | $383 | $554 | $625 | $753 |
| 6/01/11- 5/31/12 | 1.0352 | $166 | $305 | $374 | $540 | $609 | $734 |
| 6/01/10- 5/31/11 | 1.0337 | $161 | $294 | $361 | $522 | $589 | $709 |
| 6/01/09- 5/31/10 | 1.0220 | $155 | $285 | $349 | $505 | $569 | $686 |
| 6/01/08- 5/31/09 | 1.0399 | $152 | $279 | $342 | $494 | $557 | $671 |
| 6/01/07-5/31/08 | 1.0516 | $146 | $268 | $329 | $475 | $536 | $645 |
| 6/01/06-5/31/07 | 1.0256 | $139 | $255 | $313 | $452 | $509 | $614 |
| 6/1/05-5/31/06 | 1.0427 | $136 | $249 | $305 | $441 | $497 | $598 |
| 6/1/04-5/31/05 | 1.0455 | $130 | $239 | $293 | $423 | $476 | $574 |
| 6/1/03-6/1/04 | 1.0507 | $124 | $228 | $280 | $405 | $456 | $549 |
| 6/1/02-5/31/03 | 1.0727 | $118 | $217 | $267 | $385 | $434 | $522 |
| 6/1/01-5/31/02 | 1.0407 | $110 | $203 | $249 | $359 | $404 | $487 |
| 6/1/00-5/31/01 | 1.0529 | $106 | $195 | $239 | $345 | $388 | $468 |
| 6/1/99-5/31/00 | 1.0491 | $101 | $185 | $227 | $328 | $369 | $444 |
| 6/1/98-5/31/99 | 1.0439 | $96 | $176 | $216 | $312 | $352 | $424 |
| 6/1/97-5/31/98 | 1.0419 | $92 | $169 | $207 | $299 | $337 | $406 |
| 6/1/96-5/31/97 | 1.0396 | $88 | $162 | $198 | $287 | $323 | $389 |

| 6/1/95-5/31/96 | 1.032 | $85 | $155 | $191 | $276 | $311 | $375 |
| 6/1/94-5/31/95 | 1.0237 | $82 | $151 | $185 | $267 | $301 | $363 |

The methodology of calculation and benchmarking for this Updated Laffey Matrix has been approved in a number of cases. See, e.g.,DL v. District of Columbia, 267 F.Supp.3d 55, 69 (D.D.C. 2017)

* ï¿½Years Out of Law Schoolï¿½ is calculated from June 1 of each year, when most law students graduate. ï¿½1-3" includes an attorney in his 1st, 2nd and 3rd years of practice, measured from date of graduation (June 1). ï¿½4-7" applies to attorneys in their 4th, 5th, 6th and 7th years of practice. An attorney who graduated in May 1996 would be in tier ï¿½1-3" from June 1, 1996 until May 31, 1999, would move into tier ï¿½4-7" on June 1, 1999, and tier ï¿½8-10" on June 1, 2003.

** The Adjustment Factor refers to the nation-wide Legal Services Component of the Consumer Price Index produced by the Bureau of Labor Statistics of the United States Department of Labor.

# EXHIBIT 4

## THE FITZPATRICK MATRIX

Hourly Rates ($) for Legal Fees for Complex Federal Litigation in the District of Columbia

| Years Exp. / Billing Yr. | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 35+ | 535 | 563 | 591 | 619 | 647 | 675 | 703 | 731 | 736 | 760 | 807 | 864 | 933 |
| 34 | 534 | 562 | 590 | 618 | 646 | 674 | 702 | 729 | 734 | 758 | 805 | 862 | 931 |
| 33 | 532 | 560 | 588 | 616 | 644 | 672 | 700 | 728 | 733 | 757 | 804 | 861 | 930 |
| 32 | 530 | 558 | 586 | 614 | 642 | 670 | 698 | 726 | 730 | 754 | 801 | 858 | 927 |
| 31 | 527 | 555 | 583 | 611 | 639 | 667 | 695 | 723 | 728 | 752 | 799 | 856 | 924 |
| 30 | 524 | 552 | 580 | 608 | 636 | 664 | 692 | 720 | 725 | 749 | 795 | 851 | 919 |
| 29 | 521 | 549 | 577 | 605 | 633 | 661 | 689 | 717 | 721 | 745 | 791 | 847 | 915 |
| 28 | 517 | 545 | 573 | 601 | 629 | 657 | 685 | 713 | 717 | 741 | 787 | 843 | 910 |
| 27 | 512 | 540 | 568 | 596 | 624 | 652 | 680 | 708 | 713 | 736 | 782 | 838 | 905 |
| 26 | 508 | 536 | 564 | 592 | 620 | 648 | 676 | 704 | 708 | 731 | 776 | 831 | 897 |
| 25 | 502 | 530 | 558 | 586 | 614 | 642 | 670 | 698 | 703 | 726 | 771 | 826 | 892 |
| 24 | 497 | 525 | 553 | 581 | 609 | 637 | 665 | 693 | 697 | 720 | 765 | 819 | 885 |
| 23 | 491 | 519 | 547 | 575 | 603 | 630 | 658 | 686 | 691 | 714 | 758 | 812 | 877 |
| 22 | 484 | 512 | 540 | 568 | 596 | 624 | 652 | 680 | 684 | 707 | 751 | 804 | 868 |
| 21 | 477 | 505 | 533 | 561 | 589 | 617 | 645 | 673 | 677 | 699 | 742 | 795 | 859 |
| 20 | 470 | 498 | 526 | 553 | 581 | 609 | 637 | 665 | 670 | 692 | 735 | 787 | 850 |
| 19 | 462 | 490 | 518 | 546 | 574 | 602 | 630 | 658 | 662 | 684 | 726 | 778 | 840 |
| 18 | 453 | 481 | 509 | 537 | 565 | 593 | 621 | 649 | 653 | 675 | 717 | 768 | 829 |
| 17 | 445 | 473 | 500 | 528 | 556 | 584 | 612 | 640 | 645 | 666 | 707 | 757 | 818 |
| 16 | 435 | 463 | 491 | 519 | 547 | 575 | 603 | 631 | 635 | 656 | 697 | 746 | 806 |
| 15 | 426 | 454 | 482 | 510 | 538 | 566 | 593 | 621 | 626 | 647 | 687 | 736 | 795 |
| 14 | 416 | 443 | 471 | 499 | 527 | 555 | 583 | 611 | 615 | 635 | 674 | 722 | 780 |
| 13 | 405 | 433 | 461 | 489 | 517 | 545 | 573 | 601 | 605 | 625 | 664 | 711 | 768 |
| 12 | 394 | 422 | 450 | 478 | 506 | 534 | 562 | 590 | 594 | 614 | 652 | 698 | 754 |
| 11 | 382 | 410 | 438 | 466 | 494 | 522 | 550 | 578 | 582 | 601 | 638 | 683 | 738 |
| 10 | 371 | 399 | 427 | 455 | 483 | 510 | 538 | 566 | 570 | 589 | 625 | 669 | 723 |
| 9 | 358 | 386 | 414 | 442 | 470 | 498 | 526 | 554 | 558 | 576 | 612 | 655 | 707 |
| 8 | 345 | 373 | 401 | 429 | 457 | 485 | 513 | 541 | 545 | 563 | 598 | 640 | 691 |
| 7 | 332 | 360 | 388 | 416 | 444 | 472 | 500 | 528 | 532 | 550 | 584 | 625 | 675 |
| 6 | 319 | 347 | 375 | 403 | 431 | 458 | 486 | 514 | 518 | 535 | 568 | 608 | 657 |
| 5 | 305 | 332 | 360 | 388 | 416 | 444 | 472 | 500 | 504 | 521 | 553 | 592 | 639 |
| 4 | 290 | 318 | 346 | 374 | 402 | 430 | 458 | 486 | 489 | 505 | 536 | 574 | 620 |
| 3 | 275 | 303 | 331 | 359 | 387 | 415 | 443 | 471 | 474 | 490 | 520 | 557 | 602 |
| 2 | 260 | 287 | 315 | 343 | 371 | 399 | 427 | 455 | 458 | 473 | 502 | 538 | 581 |
| 1 | 244 | 272 | 300 | 328 | 356 | 384 | 412 | 439 | 442 | 457 | 485 | 519 | 561 |
| 0 | 227 | 255 | 283 | 311 | 339 | 367 | 395 | 423 | 426 | 440 | 467 | 500 | 540 |
| P* | 130 | 140 | 150 | 160 | 169 | 179 | 189 | 199 | 200 | 207 | 220 | 236 | 255 |

* = Paralegals/Law Clerks

*Published by the U.S. Attorney's Office for the District of Columbia, Civil Division*

Explanatory Notes

1. This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared to assist with resolving requests for attorney's fees in complex civil cases in District of Columbia federal courts handled by the Civil Division of the United States Attorney's Office for the District of Columbia. It has been developed to provide "a reliable assessment of fees charged for complex federal litigation in the District [of Columbia]," as the United States Court of Appeals for the District of Columbia Circuit urged. *DL v. District of Columbia*, 924 F.3d 585, 595 (D.C. Cir. 2019). The matrix has not been adopted by the Department of Justice generally for use outside the District of Columbia, nor has it been adopted by other Department of Justice components.

2. The matrix is intended for use in cases in which a fee-shifting statute permits the prevailing party to recover "reasonable" attorney's fees. *E.g.,* 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412(b). A "reasonable fee" is a fee that is sufficient to attract an adequate supply of capable counsel for meritorious cases. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010). The matrix is not intended for use in cases in which the hourly rate is limited by statute. *E.g.,* 28 U.S.C. § 2412(d).

3. For matters in which a prevailing party agrees to payment pursuant to this fee matrix, the United States Attorney's Office will not request that a prevailing party offer the additional evidence that the law otherwise requires. *See, e.g., Eley v. District of Columbia*, 793 F.3d 97, 104 (D.C. Cir. 2015) (quoting *Covington v. District of Columbia*, 57 F.3d 1101, 1109 (D.C. Cir. 1995) (requiring "evidence that [the] 'requested rates are in line with those prevailing in the community for similar services'")).

4. The years in the column on the left refer to an attorney's years of experience practicing law. Normally, an attorney's experience will be calculated based on the number of years since an attorney graduated from law school. If the year of law school graduation is unavailable, the year of bar passage should be used instead. Thus, an attorney who graduated from law school in the same year as the work for which compensation is sought has 0 years of experience. For all work beginning on January 1 of the calendar year following graduation (or bar admission), the attorney will have 1 year of experience. (For example, an attorney who graduated from law school on May 30 will have 0 years of experience until December 31 of that same calendar year. As of January 1, all work charged will be computed as performed by an attorney with 1 year of experience.) Adjustments may be necessary if an attorney did not follow a typical career progression or was effectively performing law clerk work. *See, e.g., EPIC v. Dep't of Homeland Sec.*, 999 F. Supp. 2d 61, 70-71 (D.D.C. 2013) (attorney not admitted to bar compensated at "Paralegals & Law Clerks" rate).

5. The data for this matrix was gathered from the dockets of cases litigated in the U.S. District Court for the District of Columbia using the following search in July 2020 in Bloomberg Law: keywords ("motion n/5 fees AND attorney!") + filing type ("brief," "motion," or "order") + date ("May 31, 2013 – May 31, 2020" under "Entries (Docket and Documents)"). This returned a list of 781 cases. Of those, cases were excluded if there was no motion for fees filed, the motions for fees lacked necessary information, or the motions involved fees not based on hourly rates, involved rates explicitly or implicitly based on an existing fee matrix, involved rates explicitly or implicitly subject to statutory fee caps (e.g., cases subject to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d)), or used lower rates prescribed by case law (*e.g., Eley*, 793 F.3d at 105 (Individuals with Disabilities in Education Act cases)). After these excisions, 86 cases, many of which included data for multiple billers (and 2 of which only provided hourly rate data for paralegals), remained.

6.  The cases used to generate this matrix constitute complex federal litigation—which caselaw establishes as encompassing a broad range of matters tried in federal court. *E.g.*, *Reed v. District of Columbia*, 843 F.3d 517, 527-29 (D.C. Cir. 2016) (Tatel, J., concurring) (noting that cases arising under the Freedom of Information Act, Title VII, the Americans with Disabilities Act, Constitutional Amendments, antitrust statutes, and others have been deemed complex, and even "relatively small" cases can constitute complex federal litigation, as they too require "specialized legal skills" and can involve "complex organizations," such as "large companies"); *Miller v. Holzmann*, 575 F. Supp. 2d 2, 14-16, 17 (D.D.C. 2008) (prevailing market rates for complex federal litigation should be determined by looking to "a diverse range of cases"). That the attorneys handling these cases asked the court to award the specified rates itself demonstrates that the rates were "'adequate to attract competent counsel, [while] not produc[ing] windfalls to attorneys.'" *West v. Potter*, 717 F.3d 1030, 1033 (D.C. Cir. 2013) (quoting *Blum v. Stenson*, 465 U.S. 886, 897 (1984)). As a consequence, the resulting analysis yields the "prevailing market rate[] in the relevant community" for complex litigation undertaken in federal courts in the District of Columbia. *See Blum*, 465 U.S. at 895.

7.  From these 86 complex federal cases, the following information was recorded for 2013 and beyond: hourly rate, the calendar year the rate was charged, and the number of years the lawyer was out of law school when the rate was charged (or, if law school graduation year was unavailable, years since bar passage), as defined above. If the graduation or bar passage year was not stated in a motion or its exhibits, then the lawyer's biography was researched on the internet. Although preexisting fee matrices for the District of Columbia provide for mid-year rate changes, very few lawyers in the data submitted rates that changed within a calendar year. For this reason, the matrix was modeled using one rate for each calendar year. On the occasions when a lawyer expressed an hourly rate as a range or indicated the rate had increased during the year, the midpoint of the two rates was recorded for that lawyer-year.

8.  The matrix of attorney rates is based on 675 lawyer-year data points (one data point for each year in which a lawyer charged an hourly rate) from 419 unique lawyers from 84 unique cases. The lawyer-year data points spanned from years 2013 to 2020, from $100 to $1250, and from less than one year of experience to 58 years.

9.  Paralegal/law clerk rates were also recorded. The following titles in the fee motions were included in the paralegal/law clerk data: law clerk, legal assistant, paralegal, senior legal assistant, senior paralegal, and student clerk. The paralegal/law clerk row is based on 108 paralegal-year data points from 42 unique cases. They spanned from 2013 to 2019 and from $60 to $290. (It is unclear how many unique persons are in the 108 data points because paralegals were not always identified by name.)

10. The matrix was created with separate regressions for the lawyer data and the paralegal data. For the paralegal data, simple linear least-squares regression was used with the dependent variable hourly rate and the independent variable the year the rate was charged subtracted from 2013; years were combined into one variable and subtracted from 2013 rather than modeled as separate indicator variables to constrain annual inflation to a constant, positive number. The resulting regression formula was rate = 129.8789 + 9.902107 * (year-2013). For the lawyer data, least-squares regression was used with the dependent variable hourly rate and independent variables the year the rate was charged and the number of years of experience of the lawyer when the rate was charged. The year the rate was charged was subtracted from 2013 and modeled linearly as with the paralegal data. The number of years out of law school (or since year of bar passage) was modeled with both linear and squared terms, as is common in labor economics to account for non-linear wage growth (e.g., faster growth earlier in one's career than at the end of one's career). *See, e.g.*, Jacob Mincer, *Schooling, Experience, and Earnings* (1974). The resulting regression formula was

rate = 227.319 + 16.54492 * experience - 0.2216217 * experience ^ 2 + 27.97634 * (year-2013).  Regressions were also run with log transformed rates and with a random-effect model (to account for several lawyers appearing more than once in the data), but both alternatives resulted in mostly lower rates than those reflected here; in order to minimize fee disputes, these models were therefore rejected in favor of the more generous untransformed, fixed-effect model.  Rates from one case comprised 20% of the data; the regression was also run without that case, but the resulting rates were mostly lower and therefore rejected, again to minimize fee disputes.

11. The data collected for this matrix runs through 2020.  To generate rates after 2020, an inflation adjustment (rounded to the nearest whole dollar) has been added.  The United States Attorney's Office determined that, because courts and many parties have employed the legal services index of the Consumer Price Index to adjust attorney hourly rates for inflation, this matrix would do likewise.  *E.g.*, *Salazar v. District of Columbia*, 809 F.3d 58, 64-65 (D.C. Cir. 2015); *Eley*, 793 F.3d at 101-02; *DL*, 924 F.3d at 589-90.  That was the approach followed for the years 2021 through and including 2023.  However, the Bureau of Labor Statistics has now ceased consistently publishing monthly data for the legal services index of the Consumer Price Index.  As an alternative, the legal services index of the Producer Price Index, which continues regularly to provide updated data, has been used to generate the rates for 2024 and thereafter.

12. This matrix was researched and prepared by Brian Fitzpatrick, the Milton R. Underwood Chair in Free Enterprise and Professor of Law at Vanderbilt Law School, with the help of his students.

13. This matrix and an alternative, preexisting matrix were extensively examined, and, based on that analysis, this matrix was the one selected for computation of the hourly rates for the attorneys' fees awarded in *J.T. v. District of Columbia*, 652 F. Supp. 3d 11 (D.D.C. 2023) (Howell, C.J.), and in *Brackett v. Mayorkas*, Civ. A. No. 17-0988, 2023 WL 5094872 (D.D.C. Aug. 9, 2023) (Boasberg, C.J.).

# EXHIBIT 5

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
Judge Philip A. Brimmer
Magistrate Judge Kathleen M. Tafoya

Civil Action No. 1:14-cv-01792-PAB

SAVITRI PANDEOSINGH,

        Plaintiff,

v.

AMERICAN MEDICAL RESPONSE, INC.,
GLOBAL MEDICAL RESPONSE, INC., and
EMERGENCY MEDICAL SERVICES CORP.,

        Defendants.

---

**DECLARATION OF TERRENCE P. COLLINGSWORTH IN SUPPORT OF
PLAINTIFF'S ITEMIZED CALCULATION OF COSTS & FEES ASSOCIATED WITH
BRINGING HER MOTION TO COMPEL DOCUMENTS ON DEFENDANTS'
PRIVILEGE LOGS IN THE DISTRICT OF COLORADO**

---

I, Terrence P. Collingsworth, declare that the following facts are true and correct based

upon my personal knowledge:

1.      I am the managing partner of the Washington, D.C. office of the law firm Conrad

& Scherer, LLP, located at 1156 15th Street NW, Suite 502, Washington, D.C. 20005.

2.      I submit this declaration in support of Plaintiff's Itemized Calculation of Costs &

Fees Associated with Bringing her Motion to Compel Documents on Defendants' Privilege Logs

in the District of Colorado, filed pursuant to this Court's Order of October 30, 2014 awarding

Plaintiff her reasonable attorneys' fees and costs for bringing this motion before this Court.

3.      Other than the attorneys' fees described below, Plaintiff incurred no other

administrative costs or expenses associated with bringing her Motion to Compel Documents

("Motion to Compel" or "Motion") or her Reply in Support of her Motion to Compel Documents

("Reply") in the District of Colorado.

4.     Plaintiff claims the reasonable attorneys' fees her counsel necessarily incurred in

refiling her Motion to Compel in the District of Colorado, ECF No. 31, as well as the fees

incurred in bringing her Reply in Support, ECF No. 65, as this Reply was necessary to fully brief

this motion before this Court.  Per this Court's Order, Plaintiff is not claiming any costs

associated with drafting or filing her original Motion to Compel in the Eastern District of New

York, but only those fees necessary to convert this original Motion to the District of Colorado's

rules and procedures for refiling, and those fees necessary to draft an original Reply in the

District of Colorado.  *See* ECF No. 78 ("Plaintiff[] shall be awarded their reasonable costs and

attorney's fees associated with bringing the instant motion before this court against the

Defendants.") (emphasis in original).

5.     Attached hereto as Exhibits 1-4 are the true and correct timesheets for each

attorney and paralegal who performed work on the Motion or Reply. These time sheets are kept

in the normal course of business.  Tasks for which Plaintiff's counsel is claiming fees include:

drafting, editing or revising the Motion or Reply and accompanying documents, including time

spent converting the Motion from its original format as filed the Eastern District of New York to

conform to all rules and legal standards in the District of Colorado; legal research regarding the

Motion or the Reply; internal conferences or meetings regarding the Motion or Reply; and the

filing of the Motion and Reply.  Redactions in the timesheets reflect case tasks that were not

related to the filing of this Motion to Compel or the Reply.

6.      The individuals who performed work on the Motion and Reply are Terrence Collingsworth, Managing Partner; Charity Ryerson, Associate; Cassandra Webster Lenning, Associate; and Lesley Wharton, Paralegal.

7.      Attached hereto as Exhibit 1 is a true and correct copy of my own timesheet reflecting time spent on Plaintiff's Reply, totaling 2.25 hours.  I spent no time bringing Plaintiff's original Motion before this Court.

8.      Attached hereto as Exhibit 2 is a true and correct copy of the timesheet of Charity Ryerson, reflecting a total of 8.5 hours spent on Plaintiff's Reply.  Ms. Ryerson spent no time bringing Plaintiff's original Motion before this Court.

9.      Attached hereto as Exhibit 3 is a true and correct copy of the timesheet of Cassandra Webster Lenning (née Cassandra D. Webster), reflecting a total of 0.9 hours spent on Plaintiff's Reply.  Ms. Lenning spent no time bringing Plaintiff's original Motion before this Court.

10.      Attached hereto as Exhibit 4 are true and correct copies of the timesheets of Lesley Wharton, reflecting time spent on both converting Plaintiff's original Motion as filed in the Eastern District of New York to the applicable rules and standards of the District of Colorado for refiling, as well as time spent on Plaintiff's Reply.  As Ms. Wharton worked simultaneously on several motions and replies being filed concurrently, pursuant to this Court's Order of July 16, 2014, ECF No. 23, her timesheets do not expressly identify the time that was specifically devoted to Plaintiff's Motion to Compel and Reply.  Therefore, each of her time entries has been divided equally by the number of motions on which she was working to reasonably determine how much time was devoted to her work on the Motion and Reply.  Counsel has included with

asterisk and red font on each page of Exhibit 4 a detailed description of this process and the

aggregate number of hours Ms. Wharton spent on both the Motion and Reply, which, together,

total 3.695 hours.

11.      Normally, the standard hourly billing rates used by Conrad & Scherer, LLP for

each individual who performed work on the Motion and Reply in the above-captioned case

would be as follows:

- Terrence Collingsworth, Partner: $550

- Charity Ryerson, Associate: $250

- Cassandra Webster Lenning, Associate: $250

- Lesley Wharton, Paralegal: $125

However, as these standard hourly rates used by Conrad & Scherer, LLP were once reduced by

the Eastern District of New York in awarding costs to Plaintiff based on the prevailing market

rate in New York, *see* ECF No. 1-304 at 3, Plaintiff here uses the rates imposed by the Eastern

District of New York, which are as follows:

- Terrence Collingsworth, Partner: $400

- Charity Ryerson, Associate: $150

- Cassandra Webster Lenning, Associate: $150

- Lesley Wharton, Paralegal: $80

12.      In addition to being the managing partner of the Washington, D.C. office of

Conrad & Scherer, LLP, I have over thirty years' experience as a litigator, primarily handling

complex international cases. My work has focused on civil rights, human rights, complex civil

litigation and appellate work. I have also taught constitutional and employment law at several

law schools.

13.     Charity Ryerson is an associate with Conrad & Scherer, LLP.  She has been with
Conrad & Scherer, LLP since she graduated from Georgetown University Law Center in 2012,
and is primarily focused on international human rights and other civil litigation.

14.     Cassandra Webster Lenning is an associate with Conrad & Scherer, LLP.  She
graduated from Duke University School of Law in 2011, and has three years of civil litigation
experience, primarily in international human rights and state tort law.

15.     Lesley Wharton is a paralegal with Conrad & Scherer, LLP with over four years
of civil litigation and arbitration experience in both state and federal court.  Ms. Wharton's legal
experience has predominantly focused on labor and employment claims and international human
rights law.

16.     Attached hereto as Exhibit 5 is spreadsheet of the total attorneys' fees claimed for
each individual based on the hourly rates identified in paragraph 11 above, as well as the grand
total Plaintiff's counsel claims in attorneys' fees associated with bringing this Motion and Reply.
Plaintiff's total attorneys' fees for refiling her Motion to Compel, ECF No. 31, and bringing her
Reply in Support, ECF No. 65, are $2,605.60.

I declare that the foregoing evidence is true and correct, and accurately represents the
fees Plaintiff's counsel necessarily and reasonably incurred in refiling Plaintiff's Motion to
Compel Documents on Defendants' Privilege Logs before the District of Colorado, as well as
bringing for the first time her Reply in Support.

Dated: November 6, 2014

_____

Terrence P. Collingsworth

# EXHIBIT 6

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INTERNATIONAL RIGHTS ADVOCATES,
621 Maryland Ave, NE, Washington, DC 20002

        Plaintiff,

V.

TESLA, INC.,
1 Tesla Road, Austin, TX 78725

        Defendant.

Civil Action No. _____

## DECLARATION OF ANDREW S. POLLIS

I, Andrew S. Pollis, declare that I am over 18 years of age and competent to testify as to the matters herein, which are based on my personal knowledge:

1.      I am a Professor of Law at Case Western Reserve University School of Law, where I have directed the law school's Appellate Litigation Clinic since 2019 and also teach Evidence. Between 2008 and 2018, I directed the law school's Civil Litigation Clinic. Before joining the Case Western faculty, I practiced civil litigation for nearly two decades at Hahn Loeser & Parks LLP in Cleveland, Ohio.

2.      Over the course of my career, I have litigated dozens of plaintiff-side consumer-protection cases, including cases involving allegations of false or misleading statements to consumers. My experience includes successfully representing consumers in deceptive-trade and unfair-practice cases in trial courts and on appeal. I am familiar with the work required to prepare and prosecute or defend major litigation matters, including consumer-protection and fraud cases. Specifically, I have direct experience in all of the phases of civil litigation, including pre-suit investigation, preparation of a complaint and discovery requests, document production and review,

depositions, expert reports and discovery, prosecution and defense of summary-judgment motions, trial preparation, trial, and appeal. I have also had supervisory and billing responsibility for other attorneys working on these types of projects, so I am familiar with the process of budgeting for litigation requiring the involvement of multiple attorneys and litigation support staff.

3.      I have reviewed the complaint in this action. I have also reviewed generally the record in the case brought by International Rights Advocates in the District of Columbia against Mars, Incorporated and others, Case Nos. 2023-CAB-007264 (D.C. Super. Ct.) and 24-cv-894 (D.D.C.). The latter had a posture similar to this case and involves similar claims under the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.*

4.      In my opinion, the first phase of the litigation—pre-suit investigation, drafting the complaint, drafting discovery requests, prosecuting a motion to remand, and defending a motion to dismiss—will alone require more than 170 hours for IRA's attorneys, regardless of how they choose to staff the matter. In my opinion, and based on the experience and review recited above, the attorneys representing IRA will reasonably need to expend well in excess of that amount to litigate this case to conclusion, again regardless of how they choose to staff the matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 13th day of October 2025, at Cleveland, Ohio.

Andrew S. Pollis

# EXHIBIT 7

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| INTERNATIONAL RIGHTS ADVOCATES, 621 Maryland Ave NE, Washington, D.C. 20002 <br><br>      Plaintiff, <br>   v. <br><br> TESLA, INC., 1 Tesla Road Austin, TX 78725. <br><br>      Defendant. | Case No. <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

## PREAMBLE

International Rights Advocates ("IRAdvocates" or "Plaintiff") brings this action against Defendant Tesla, Inc. ("Tesla" or "Defendant") and alleges the following based on personal knowledge, information, and belief. This Complaint is on behalf of the general public of the District of Columbia, which comprises District of Columbia consumers, and is brought under the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code §§ 28-3901–13. This is not a class action, and no class certification or money damages will be sought. IRAdvocates seeks to represent the general public of the District of Columbia, and not their members specifically.

## INTRODUCTION

1.   This case seeks to ensure that D.C. consumers have complete, and not misleading, information about Tesla's sourcing of key minerals used in its technological Products (the "Products").

2.   With growing consumer awareness of human rights, ethical labor practices, and environmental sustainability, responsibly sourced technology is a growing demand in the global

- 1 -

marketplace. Companies are emerging—or, like Tesla, expanding—by promoting Products that purportedly meet ethical standards, giving consumers the innovation they want without the human or environmental cost.

3.     Tesla supplies the public with electric vehicles, batteries, and technology Products that it represents as ethically sourced and socially responsible. Tesla states, and consumers reasonably believe, that it sources its minerals responsibly—including that it upholds fair labor standards and ensures the ethical treatment of people in its supply chain; sources minerals free from corruption and forced labor; and is dedicated to protecting human rights and the environment.

4.     Contrary to the beliefs Tesla creates in consumers via its representations, Tesla's sourcing practices do not align with these claims. Tesla sources cobalt from companies that commit labor rights abuses and rely on forced labor; destroy the surrounding environment; kill and maim local community members; and engage in corruption.

5.     These sourcing practices contradict Tesla's public representations and the expectations they create in consumers. Tesla continues to market its Products as environmentally responsible and ethically sourced—reinforcing these representations across its branding, investor communications, and consumer-facing materials—all to Tesla's profit and benefit.

6.     On behalf of the general public, and in the interest of consumers, IRAdvocates brings this action against Tesla for false and deceptive marketing representations and material omissions concerning Tesla's sourcing of minerals used in its Products.

7.     Tesla's failure to disclose the true nature of its mineral sourcing practices constitutes a clear violation of consumer protection laws and ethical business standards.

8.     This false and deceptive marketing, and the associated material omissions, give rise to this suit for declaratory and injunctive relief.

9.    The CPPA gives D.C. consumers the right to truthful marketing about the qualities, sourcing, and manufacturing practices of the Products they are sold. *See* D.C. Code § 28-3901(c).

## BACKGROUND

10.    A critical mineral is "[a]ny non-fuel mineral, element, substance, or material that . . . (i) has a high risk of supply chain disruption; and (ii) serves an essential function in one or more energy technologies, including technologies that produce, transmit, store, and conserve energy."[1] The critical mineral at issue in this Complaint is cobalt.

11.    The cobalt Tesla sources is from the "Copperbelt" region of the Democratic Republic of Congo ("DRC"), which encompasses the modern-day provinces of Lualaba, Haut-Katanga, and Haut-Lomami.[2] Kolwezi, the capital of Lualaba, is the "cobalt capital of the world."[3]

12.    Tesla sources over half of its cobalt from large, industrial mines that rely on mechanized modes of production.[4] These include Glencore plc's ("Glencore") Kamoto Copper Company ("KCC") mine in Kolwezi and Mutanda Mining ("MUMI") site in Lualaba.

13.    Tesla also purchases its cobalt from Chinese fine refiners: Guizhou CNGR, Hunan CNGR, and Huayou Cobalt ("Huayou"). Huayou obtains cobalt from DRC artisanal and large-scale mining sources and blends these together during the refining process.[5] Artisanal mining is typically performed by hand or with rudimentary tools and is thus more labor-intensive than large-

---

[1] *What Are Critical Materials and Critical Minerals?*, U.S. Dep't Energy, https://www.energy.gov/cmm/what-are-critical-materials-and-critical-minerals (last visited Aug. 12, 2025).

[2] Andrew L. Gulley, *One Hundred Years of Cobalt Production in the Democratic Republic of the Congo*, 79 Res. Pol'y 1, 2 (2022).

[3] Didier Makal & Eric Cibamba, *Mine in 'World Cobalt Capital' Displaces Locals and Monks under Questionable Circumstances*, Mongabay (Oct. 23, 2023), https://news.mongabay.com/2023/10/mine-in-world-cobalt-capital-displaces-locals-and-monks-under-questionable-circumstances/.

[4] Fred Lambert, *Tesla Releases List of Battery Material Suppliers, Confirms Long-Term Nickel Deal with Vale*, Electrek (May 6, 2022), https://electrek.co/2022/05/06/tesla-list-battery-material-suppliers-long-term-nickel-deal-vale/.

[5] *See* OECD, *Interconnected Supply Chains: A Comprehensive Look at Due Diligence Challenges and Opportunities Sourcing Cobalt and Copper from the Democratic Republic of the Congo* 17 (2019), https://www.oecd.org/content/dam/oecd/en/publications/reports/2019/11/interconnected-supply-chains_cec91fc0/576804e7-en.pdf.

scale mining.[6]

## PARTIES

14.      Plaintiff IRAdvocates is a 501(c)(3) nonprofit public-interest organization headquartered in Washington, D.C. Its mission is to expose human rights violations and hold corporations accountable, with a particular focus on abuses committed by multinational companies within their supply chains.[7]

15.      As part of its work, IRAdvocates engages in litigation, conducts research, and educates the public—including consumers—about widespread human rights violations and the persistent failure of corporations to honor their commitments to humane labor practices.

16.      IRAdvocates advances this mission by investigating abuses, collaborating with partners to uncover ongoing violations, litigating against offending corporations, and conducting public outreach through reports, articles, and blog posts.

17.      Defendant Tesla is a technology and automotive company focused on electric vehicles, energy storage, and sustainable energy solutions.[8] Tesla designs and manufactures electric cars like the Model 3, Model Y, and Cybertruck, alongside battery Products and solar technology.

18.      Tesla is headquartered in Texas and incorporated in Delaware.

19.      Tesla operates a vehicle sales location and numerous charging stations within the District of Columbia. In addition, consumers located in the District can purchase Tesla Products directly through the company's website.

## JURISDICTION AND VENUE

---

[6] Sarah Way, *Integrating Artisanal Mining into the Formal Economy Would Benefit African Miners and Economies Alike*, Atlantic Council (July 12, 2024), https://www.atlanticcouncil.org/blogs/africasource/integrating-artisanal-mining-into-the-formal-economy-would-benefit-african-miners-and-economies-alike/.
[7] *About Us*, Int'l Rts. Advocates, https://www.internationalrightsadvocates.org/about-us (last visited Aug. 12, 2025).
[8] *About Us*, Tesla, https://www.tesla.com/about (last visited Aug. 13, 2025).

20.     This court has personal jurisdiction over the Parties in this case.

21.     IRAdvocates, by filing this Complaint, consents to this Court having personal jurisdiction over it. IRAdvocates is also domiciled in the District of Columbia.

22.     This Court has personal jurisdiction over Tesla pursuant to D.C. Code § 13-423(a)(1). Tesla has sufficient minimum contacts with the District of Columbia to support this Court's exercise of jurisdiction, as it engages in deceptive acts and practices directed at individuals residing in, doing business in, or located within the District. Tesla also purposefully avails itself of the protections and benefits of District law by marketing and selling its vehicles, and by operating charging stations within the District.

23.     Tesla operates a vehicle sales location within the District of Columbia, as reflected on its official website. The website specifically targets District consumers through a store locator feature, designed to direct residents to locations within the District where they can test-drive and purchase Tesla vehicles. Below is a screenshot from Tesla's website highlighting the District-based store location.[9]

---

[9] *US Tesla Stores and Galleries*, Tesla, https://www.tesla.com/findus/list/stores/United+States (last visited Aug. 13, 2025).

# District Of Columbia

### 3307 M St NW Washington DC

3307 M St NW
Washington, DC 20007

Phone Number   (202) 916-3936

Schedule a Demo Drive

24.    Tesla operates Supercharger stations for its electric vehicles within Washington, D.C. and its website actively directs District consumers to those locations, as illustrated below.[10]



---

[10]   *Find Us, Washington, D.C.*, Tesla, https://www.tesla.com/findus?bounds=38.97915072611632%2C-76.77905658534044%2C38.8084024054081%2C-77.25009540369982&search=Washington%2C%20DC (last visited Aug. 13, 2025).

25.     Tesla operates an interactive website where consumers from the District can purchase Tesla Products.[11]

26.     Tesla also uses this website to ensure that its marketing and representations are effectively received by consumers within the District, such as by making its website accessible to consumers who visit Tesla stores via on-site computers.

27.     The Court has subject matter jurisdiction over this action pursuant to D.C. Code § 28-3905(k)(2).

28.     Venue is proper in this Court under D.C. Code § 28-3905(k)(2) because Tesla aims their marketing and advertising material at consumers within the District. Tesla's internet advertising is accessible in the District. Tesla Products and services can be, and are, purchased by District consumers online and in stores.

## STATUTORY FRAMEWORK

29.     This action is brought under the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901–13.

30.     The CPPA makes it a violation for "any person" to, *inter alia*:

Represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;

Represent that goods or services are of a particular standard, quality, grade, style, or model, if in fact they are of another;

Misrepresent as to a material fact which has a tendency to mislead;

Fail to state a material fact if such failure tends to mislead;

Use innuendo or ambiguity as to a material fact, which has a tendency to mislead; or

---

[11] *Shop Tesla*, Tesla, https://shop.tesla.com/ (last visited Aug. 14, 2025).

Advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered.

D.C. Code § 28-3904(a), (d), (e), (f), (f-1), (h).

31. A violation occurs regardless of "whether or not any consumer is in fact misled, deceived or damaged thereby." *Id.* § 28-3904.

32. The CPPA "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia." *Id.* § 28-3901(c). It "shall be construed and applied liberally to promote its purpose." *Id.*

33. Because IRAdvocates is a public interest organization, it may act on behalf of the general public and bring any action that an individual consumer would be entitled to bring:

> [A] public interest organization may, on behalf of the interests of a consumer or a class of consumers, bring an action seeking relief from the use by any person of a trade practice in violation of a law of the District if the consumer or class could bring an action under subparagraph (A) of this paragraph for relief from such use by such person of such trade practice.

*Id.* § 28-3905(k)(1)(D)(i). Subparagraph (A) provides: "A consumer may bring an action seeking relief from the use of a trade practice in violation of a law of the District." *Id.* § 28-3905(k)(1)(A).

34. A public interest organization may act on behalf of consumers, i.e., the general public of the District of Columbia, so long as the organization has a "sufficient nexus to the interests involved of the consumer or class to adequately represent those interests." *Id.* § 28-3905(k)(1)(D)(ii). As set forth in this Complaint, *see supra* ¶¶ 14–16, 21, IRAdvocates is active in the District of Columbia, where it works to expose human rights violations and hold corporations accountable for abuses in global supply chains through education, policy initiatives, and litigation. IRAdvocates maintains a sufficient nexus to D.C. consumers to adequately represent their interests in this action.

35.     This is not a class action, or an action brought on behalf of any specific consumer, but an action brought by IRAdvocates on behalf of itself and the general public, i.e., D.C. consumers generally. No class certification will be requested.

36.     This action does not seek money damages. Instead, IRAdvocates seeks to end the unlawful conduct directed at D.C. consumers. Remedies available under the CPPA include "[a]n injunction against the use of the unlawful trade practice." *Id*. § 28-3905(k)(2)(D). IRAdvocates also seeks declaratory relief in the form of an order holding Tesla's conduct to be unlawful.

## CORE ALLEGATIONS

37.     Tesla represents that it responsibly sources its minerals, including that it upholds fair labor standards and ensures the ethical treatment of people in its supply chain; sources minerals free from corruption and forced labor; and is dedicated to protecting human rights and the environment. In reality, Tesla sources cobalt from corrupt suppliers known to commit labor and human rights abuses and cause environmental destruction.

### I.     Tesla Represents to D.C. Consumers That it Responsibly Sources Its Minerals.

38.     Tesla portrays itself as a company that responsibly sources minerals and is environmentally conscious.

#### A.  Tesla Represents that It Upholds Fair Labor Standards and Combats Forced Labor in Its Supply Chain.

39.     Tesla's 2023 Sustainability Report has a five-page long section describing its commitment to "Combatting Forced Labor in [its] Supply Chain."[12] In this section, the company claims that "Tesla actively combats forced labor in [its] supply chain to address risks and remedy any potential harm."[13] It also provides case studies on Tesla's supply chain due diligence efforts.

---

[12] Tesla, *Impact Report 2023*, at 113 (May 23, 2024), https://www.tesla.com/ns_videos/2023-tesla-impact-report.pdf.
[13] *Id.* at 115.

40.     On Tesla's website, the company also has an "additional resources" page where it advertises numerous ethical policies on fair labor standards to consumers.[14]

41.     Tesla's Global Human Rights Policy states that "[t]he ethical treatment of all people and regard for human rights is core to Tesla's mission of a sustainable future for all."[15]

42.     It adds that "this Global Human Rights Policy . . . is applicable to both our own operations and our supply chain, and includes the communities impacted by our operations and our direct and upstream supply chain."[16]

43.     Tesla's Forced Labor, Modern Slavery, and Human Trafficking Policy states that the company "is committed to combating any form of such abuses, including debt bondage, indentured labor, and compulsory prison labor."[17] It adds that Tesla is "committed to ensuring that [its] supply chain – from raw materials to final products – is free of such abuses."[18] When a

---

[14] *Additional Resources*, Tesla, https://www.tesla.com/legal/additional-resources (last visited Aug. 14, 2025).
[15] *Additional Resources: Tesla Global Human Rights Policy*, Tesla, https://www.tesla.com/legal/additional-resources#global-human-rights-policy (last visited Aug. 14, 2025).
[16] *Id.*
[17]     *Additional Resources: Forced Labor, Modern Slavery, and Human Trafficking*, Tesla, https://www.tesla.com/legal/additional-resources (last visited Aug. 14, 2025).
[18] *Id.*

violation of the policy is detected, Tesla claims that it "[takes] swift action to remedy the issue and improve supplier operations and conditions for workers."[19]

---

**Forced Labor, Modern Slavery, and Human Trafficking**

**(Aligned with UDHR Articles: 4, 5, 23)**

Tesla recognizes the International Labour Organization (ILO) definitions for forced labor, modern slavery, and human trafficking and is committed to combating any form of such abuses, including debt bondage, indentured labor, and compulsory prison labor. We are committed to ensuring that our supply chain – from raw materials to final products – is free of such abuses.

---

44.    Tesla's Responsible Sourcing Policy more specifically describes its expectations for suppliers and how it monitors human rights violations.[20] The company says that it is "committed to ensuring that companies in [its] supply chain . . . respect human rights" and that "wherever Tesla's supply chain has an impact, local conditions for stakeholders continuously improve."[21] Tesla states that it "will not tolerate, contribute to, or facilitate the commission by any party in [its] supply chain of . . . [a]ny forms of forced or compulsory labor."[22]

---

[19] *Id.*
[20]    *Additional Resources: Tesla Responsible Sourcing*, Tesla, https://www.tesla.com/legal/additional-resources#responsible-sourcing-policies (last visited Aug. 14, 2025).
[21] *Id.*
[22] *Id.*

**Responsible Sourcing Policy**

**Introduction and Scope**

In line with Tesla's mission to accelerate the world's transition to sustainable energy, Tesla is committed to ensuring that companies in our supply chain – tier 1 and upstream suppliers – respect human rights, protect the environment, and uphold responsible business practices. We strive to maximize the positive impact of our supply chain for people and the planet. Our goal is that wherever Tesla's supply chain has an impact, local conditions for stakeholders continuously improve because of our purchasing decisions and relationships. This Responsible Sourcing Policy ("Policy") is applicable for all materials and all sourcing regardless of sourcing location, and therefore constitutes our policy for conflict minerals (columbite-tantalite (tantalum), cassiterite (tin), gold, wolframite (tungsten), and any derivatives of these, also known as "3TG")), for which Tesla files an annual report in accordance with the Dodd-Frank Wall Street Reform and Consumer Protection Act.

We require all companies or individuals involved in a supply chain producing goods and services for Tesla, whether directly or indirectly, as well as their personnel, agents, and subcontractors, referred to hereinafter as "suppliers," to conduct their worldwide operations in a responsible manner, consistent with Tesla's mission to accelerate the world's transition to sustainable energy. Suppliers are contractually bound to adhere to this Policy, our Global Human Rights Policy, and our Supplier Code of Conduct.

45.     Tesla's Code of Business Conduct and Ethics requires its suppliers to "commit to upholding the human rights of workers, and to treating them with dignity and respect as understood by the international community" and "to use reasonable efforts to ensure that their parts and products do not contribute to armed conflict [or] human rights abuses . . . regardless of sourcing location."[23]

**Sourcing Responsibly**

Consistent with our mission, we expect our suppliers to share Tesla's commitment to social, environmental responsibility and ethical conduct. All suppliers are required to follow Tesla's Supplier Code of Conduct, both in their operations and their own supply chain. Our suppliers must commit to upholding the human rights of workers, and to treating them with dignity and respect as understood by the international community. We take proactive steps to ensure these expectations are met.

We also require suppliers to use reasonable efforts to ensure that their parts and products do not contribute to armed conflict, human rights abuses or environmental degradation, regardless of sourcing location. Our goal is to create a conflict-free value chain. As a U.S. public company, we report annually on our due diligence efforts to understand the origin of the conflict minerals used in products and steps we are taking to eliminate any benefits from our sourcing to armed groups in the Democratic Republic of the Congo and its neighboring countries.

---

[23] Tesla, *Code of Business Ethics*, at 11 (Apr. 25, 2024), https://digitalassets.tesla.com/tesla-contents/image/upload/Business_Code_Of_Ethics.

46.     Tesla, expresses its dedication to "ensuring social, environmental responsibility and ethical conduct throughout [its] supply chain, from raw materials to the doors of [its] facilities."[24]

Tesla's Mission: To accelerate the world's transition to sustainable energy.

Tesla's mission is more than just a statement, it is a guiding principle for how we govern ourselves as a company. As a company at the forefront of innovation for energy and transportation we live by the principles of hard work, exceptional performance, integrity, and fairness.

Our Supplier Code of Conduct ("Code") as well as our Human Rights & Responsible Materials policies are the foundation for ensuring social, environmental responsibility and ethical conduct throughout our supply chain, from raw materials to the doors of our facilities. The principles outlined in this Code govern our suppliers' (defined as all companies or individuals from which Tesla is receiving goods and services as well as their personnel, agents and subcontractors) relationship with Tesla and how we expect them to operate their own business. The Code represents a minimum standard which our suppliers must follow and where there are differences between the Code and applicable local or national laws and regulations, Tesla expects the supplier to follow the stricter standard.

---

[24] Tesla, *Supplier Code of Conduct* (July 2021), https://www.tesla.com/sites/default/files/about/legal/tesla-supplier-code-of-conduct.pdf.

**B. Tesla Represents that It Does Not Support Security Forces that Contribute to Human Rights Abuses.**

47.    In its Responsible Sourcing Policy on its website, Tesla states that it will not directly or indirectly support security forces and non-state armed groups that operate illegally and/or violate human rights.[25]

---

11. Direct or indirect support to non-state armed groups, public or private security forces, or their affiliates, including, but not limited to, the procurement of materials, making payments, or otherwise providing logistical assistance or equipment to those who:
   - Illegally control production sites or otherwise illegally control transportation routes, points where materials are traded, and/or upstream actors in the supply chain,
   - Illegally tax or extort money or materials at points of access to production sites, along transportation routes, or at points where materials are traded,
   - Illegally tax or extort intermediaries, export companies, or international traders, and/or
   - Do not act in accordance with the Voluntary Principles on Security and Human Rights; and

---

48.    Additionally, Tesla states that it will "not tolerate . . . . [a]ny forms of torture, cruel, inhuman, and degrading treatment" in its supply chain.[26]

---

8. Any forms of torture, cruel, inhuman, and degrading treatment;

---

**C. Tesla Represents that It Is Dedicated to Protecting the Environment.**

49.    Tesla portrays an environmentally conscious image on its consumer-facing social media pages.[27]

50.    Tesla also makes numerous representations on its website claiming that it is committed to protecting the environment.

---

[25] *Additional Resources: Tesla Responsible Sourcing*, *supra* note 21.
[26] *Id.*
[27] *See, e.g.*, Slideshow posted by Tesla (@teslamotors), Instagram, *Our 2023 Impact Report in 10 slides* (May 29, 2024), https://www.instagram.com/p/C7j7Nhat_Zx/?img_index=1.

51.     Tesla's Code of Business Conduct and Ethics requires its suppliers to "to use reasonable efforts to ensure that their parts and products do not contribute to . . . environmental degradation, regardless of sourcing location."[28]

52.     Tesla's Supplier Code of Conduct mandates the company's suppliers to protect the environment through environmental permits and reporting, pollution prevention and resource reduction, hazardous substance mitigation, air emission management, and more.[29]

---

### C. ENVIRONMENT

Suppliers recognize that environmental responsibility is integral to producing world-class products. Suppliers shall identify the environmental impacts and minimize adverse effects on the community, environment, and natural resources within their manufacturing operations, while safeguarding the health and safety of the public. Recognized management systems such as ISO14001 and the Eco Management and Audit System (EMAS) were used as references in preparing the Code and may be a useful source of additional information. Relevant environmental standards to be followed are:

---

53.     The Supplier Code of Conduct states that "[s]uppliers shall identify the environmental impacts and minimize adverse effects on the community, environment, and natural resources within their manufacturing operations, while safeguarding the health and safety of the public."[30]

54.     The Supplier Code of Conduct also instructs suppliers that "[e]missions and discharges of pollutants and generation of waste are to be minimized or eliminated at the source or by practices" and "[c]hemicals, waste, and other materials posing a hazard to humans or the environment are to be identified, labeled, and managed to ensure their safe handling, movement, storage, use, recycling or reuse, and disposal."[31]

---

[28] *Code of Business Ethics*, *supra* note 24, at 11.
[29] *Supplier Code of Conduct*, *supra* note 25.
[30] *Id.*
[31] *Id.*

> **2) Pollution Prevention and Resource Reduction**
>
> Emissions and discharges of pollutants and generation of waste are to be minimized or eliminated at the source or by practices such as adding pollution control equipment; modifying production, maintenance, and facility processes; or by other means. The use of natural resources, including water, fossil fuels, minerals, and virgin forest products, is to be conserved by practices such as modifying production, maintenance and facility processes, materials substitution, re-use, conservation, recycling, or other means.
>
> **3) Hazardous Substances**
>
> Chemicals, waste, and other materials posing a hazard to humans or the environment are to be identified, labeled, and managed to ensure their safe handling, movement, storage, use, recycling or reuse, and disposal.
>
> **4) Solid Waste**
>
> Suppliers shall implement a systematic approach to identify, manage, reduce, and responsibly dispose of or recycle solid waste (non-hazardous). They shall supply the data for all products and related services to Tesla upon request.
>
> **5) Air Emissions**
>
> Air emissions of volatile organic chemicals, aerosols, corrosives, particulates, ozone depleting substances, and combustion byproducts generated from operations are to be characterized, routinely monitored, controlled, and treated as required prior to discharge. Ozone-depleting substances are to be effectively managed in accordance with the Montreal Protocol and applicable regulations. Suppliers shall conduct routine monitoring of the performance of its air emission control systems. They shall supply the data for all products and related services to Tesla upon request.

### D. Tesla Represents That It is Against Corruption and Money Laundering.

55.     In its Responsible Sourcing Policy on its website, Tesla states that the company "will not tolerate, contribute to, or facilitate the commission by any party in [its] supply chain of . . . [c]orruption, bribery, fraudulent misrepresentation of the origin of materials, money laundering, and conflicts of interest."[32]

> 7.  Corruption, bribery, fraudulent misrepresentation of the origin of materials, money laundering, and conflicts of interest;

---

[32] *Additional Resources: Tesla Responsible Sourcing*, *supra* note 21.

56.     Tesla's Anti-Corruption Policy sets conduct standards for "all Tesla employees, partners, and suppliers."[33] It forbids bribery and improper payments across its business dealings.[34]

> As discussed above, anti-corruption laws and this Policy prohibit giving Anything of Value to a Third Party – like a supplier, agent, or consultant – when you know or have a reason to suspect that they may provide some or all of it to a Government Official for an improper purpose.

57.     This policy forbids Tesla from giving money to a supplier if it suspects that it will be used for an improper purpose by a government official.[35]

> Tesla's Policy is clear: There is no place for bribery or corruption in any of our business dealings.

## II.     Tesla's Representations Are Material to Consumers.

58.     Consumers care deeply about ethical supply chain practices, including fair labor standards, environmental sustainability, conflict-free sourcing, and the absence of forced or child labor.

59.     A 2021 survey found that 88% of global consumers prefer buying from companies with ethical sourcing.[36]

---

[33] Tesla, *Tesla Anti-Corruption Policy* (Apr. 2022), https://digitalassets.tesla.com/tesla-contents/image/upload/Anti-Corruption-Policy.pdf.
[34] *Id.*
[35] *Id.*
[36] *OpenText Survey Shows Increase in Demand for Ethically Sourced Goods*, (Sept. 29, 2021), https://www.opentext.com/about/press-releases/opentext-survey-shows-increase-in-demand-for-ethically-sourced-goods.

60.    Reports also indicate that 83% of consumers are willing to pay more for such products.[37]

61.    A Harvard study concerning the textile industry found that consumers are willing to pay more for products with marketing or advertising that indicates they were made in workplaces with fair labor standards.[38] The study showed that shoppers paid 45% more for polo shirts labeled with certified fair labor standards compared to unlabeled ones.[39]

62.    Consumers are also quick to reject unethical companies. A 2024 survey revealed that 88% of U.S. shoppers would boycott a company for irresponsible business practices, and 56% would stop buying from brands they consider unethical.[40]

63.    A national poll found that 60% of consumers would stop using a product if they learned it involved human trafficking or forced labor.[41]

64.    Environmental responsibility matters, too. Nearly half of U.S. consumers said they would change their purchasing habits to reduce environmental impact.[42]

65.    Consumers also care about corruption and money laundering in supply chains. According to a study by Consilient—a D.C.-based technology company—65% of respondents would likely change their financial institutions if they were fined for money laundering.[43]

---

[37] *Id.*

[38] Michael J. Hiscox et al., *Consumer Demand for Fair Labor Standards: Evidence from a Field Experiment on EBay* 3 (Apr. 17, 2011) (unpublished manuscript), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1811788.

[39] *Id.*

[40] Rob Biedron, *Do Consumers & Companies Care About Ethical Sourcing?*, Planergy (May 16, 2025), https://planergy.com/blog/ethical-sourcing/.

[41] Robert J. Bowman, *Why Don't More Consumers Care About Human Trafficking in the Supply Chain?*, Supply Chain Brain (Feb. 3, 2020), https://www.supplychainbrain.com/blogs/1-think-tank/post/30792-why-dont-more-consumers-care-about-human-trafficking-in-the-supply-chain.

[42] Amanda K. Beggs, *Promoting Human Rights and Environmental Sustainability: Integrating Ethics into the Supply Chain*, Foley & Lardner LLP (Mar. 26, 2024), https://www.foley.com/insights/publications/2024/03/human-rights-environmental-sustainability-ethics-supply-chain/.

[43] Consilient Inc., *Money Laundering: A Misunderstood and Underestimated Problem* 2 (2023) https://consilient.com/wp-content/uploads/2023/06/Consilient-Money-Laundering-Report-03.pdf.

66.     A 2024 PwC report found that consumers are willing to pay 9.7% more, on average, for sustainably produced or sourced goods, even amid inflation concerns.[44]

67.     Companies—including Tesla—are aware of these consumer preferences for ethical, sustainable, and conflict-free supply chains. The fact that the number of Fortune 500 companies publishing sustainability reports rose from 20% in 2011 to 85% in 2017 highlights the growing influence of these values on corporate behavior.[45] This demand drives companies to make marketing and advertising claims that appeal to consumers' ethical concerns—even when those claims may be unsubstantiated or deceptive.

### III.    Tesla's Representations About How It Sources Its Minerals Are False and Misleading.

#### A.    Tesla Sources Cobalt from Corrupt Suppliers That Commit Labor and Human Rights Abuses and Cause Environmental Harm.

68.     Tesla sources cobalt and uses it in their Products. Cobalt is a metal known for its high melting point and magnetism.[46] The element metal is indispensable to the modern technology industry as it is used to create high-powered and rechargeable batteries.[47] It is instrumental in the creation of electric vehicle batteries due to its energy density, long life cycles, stable voltage, and capacity for fast charging.[48]

69.     The DRC holds the world's largest cobalt reserves—over six million metric tons as

---

[44] *Consumers Willing to Pay 9.7% Sustainability Premium, Even as Cost-of-living and Inflationary Concerns Weigh: PwC 2024 Voice of the Consumer Survey*, PwC Global (May 15, 2024), https://www.pwc.com/gx/en/news-room/press-releases/2024/pwc-2024-voice-of-consumer-survey.html.

[45] *Flash Report: 85% of S&P; 500 Index® Companies Publish Sustainability Reports in 2017*, Governance & Accountability Inst., (Mar. 20, 2018), https://www.ga-institute.com/storage/press-releases/article/flash-report-85-of-sp-500-indexR-companies-publish-sustainability-reports-in-2017.html [https://web.archive.org/web/20230914003422/https://www.ga-institute.com/storage/press-releases/article/flash-report-85-of-sp-500-indexR-companies-publish-sustainability-reports-in-2017.html].

[46] Stephanie Pappas, *Facts About Cobalt*, Live Science (Feb. 4, 2015), https://www.livescience.com/29275-cobalt.html.

[47] *Id.*; Nat'l Minerals Info. Ctr., *Cobalt Statistics and Information*, USGS, https://www.usgs.gov/centers/national-minerals-information-center/cobalt-statistics-and-information (last visited Aug. 14, 2025).

[48] *Cobalt in EV Batteries: Advantages, Challenges, and Alternatives*, Stanford Advanced Materials (July 24, 2025), https://www.samaterials.com/cobalt-in-ev-batteries-advantages-challenges-alternatives.html.

of 2023—and is responsible for approximately 75% of global cobalt mining and output.[49]

70.    Tesla sources roughly 55% of its cobalt from direct suppliers, including Glencore's KCC and MUMI sites.[50] In 2020, Tesla and Glencore formalized a long-term supply contract in which Tesla pledged to purchase 6,000 tons of cobalt per year from Glencore.[51]

71.    In a 2025 global analysis of mineral supply chains, Glencore was one of the companies with multiple allegations of human rights abuses of businesses working in green metal extraction.[52] A report tracking allegations of human rights abuses between 2010 and 2021 found that Glencore had the highest number of human rights abuses in Africa and the worst record globally.[53]

72.    Tesla also purchases its cobalt from three Chinese fine refiners: Guizhou CNGR, Hunan CNGR, and Huayou Cobalt.[54] Fine refiners obtain cobalt from artisanal and large-scale mining sources; cobalt from different sources is blended together during the refining process into chemical precursor, battery materials, cobalt metal, and alloys for use in downstream applications.[55]

73.    Huayou has complete ownership and control over its subsidiary—Congo Dongfang International Mining SARL ("CDM")—which operates a number of artisanal mining sites.[56] It

---

[49]    *Leading Countries Based on Reserves of Cobalt Worldwide in 2024*, Statista, https://www.statista.com/statistics/264930/global-cobalt-reserves (last visited Aug. 14, 2025).
[50]    *See* Lambert, *supra* note 4; *At a Glance*, Kamoto Copper Co., https://www.kamotocoppercompany.com/en/who-we-are/at-a-glance#:~:text=Located%20in%20Kolwezi%2C%20in%20the,mines%3A%20KOV%20and%20Mashamba%20East (last visited Aug. 16, 2025).
[51]    Arndt Uhlendorff, *Tesla Signs Cobalt Deal with Glencore*, Inst. for Rare Earths & Metals (June 2020) https://en.institut-seltene-erden.de/tesla-schliesst-kobalt-abkommen-mit-glencore/.
[52]    Bus. & Human Rights. Res. Ctr., *Transition Minerals Tracker: 2025 Global Analysis* 15 (2025), https://media.business-humanrights.org/media/documents/2025_Transition_Minerals_Tracker_EN.pdf.
[53]    Bus. & Human Rights. Res. Ctr., *Transition Minerals Tracker:2021 Analysis* 3 (2022), https://media.business-humanrights.org/media/documents/Transition_Minerals_Tracker_Global_analysis.pdf.
[54]    Lambert, *supra* note 4.
[55]    OECD, *supra* note 6, at 17; World Bank, *2020 State of the Artisanal and Small-Scale Mining Sector* 147 (2020).
[56]    AfreWatch & Amnesty Int'l, *"This Is What We Die For": Human Rights Abuses in the Democratic Republic of the Congo Power the Global Trade in Cobalt*, at 53, AI Index AFR 62/3183/2016 (Jan. 2016).

also refines cobalt sourced from large industrial mining operations in the DRC. These include Sicomines (in which it is a minor stakeholder) and Tenke Fungurume Mining ("TFM"), which is owned by CMOC Group ("CMOC").[57]

74.    It is well-known that cobalt sourcing is fraught with human rights abuses and environmental harm. Cobalt from the DRC—including from industrial mines like Tesla's suppliers—is on the U.S. Department of Labor's 2024 "List of Goods Produced by Child or Forced Labor."[58] Reports consistently document the use of forced labor, hazardous working conditions, forced displacement, widespread environmental destruction, violence by security forces guarding mines, and corruption in cobalt mining operations throughout the DRC.

### 1) Tesla's Suppliers Commit Labor Rights Abuses and Rely on Forced Labor.

75.    Glencore KCC employees "work[] long hours with limited food and water for pay that often does not cover living expenses."[59] KCC workers say that they receive inadequate compensation that is "not enough to meet their daily needs."[60]

76.    U.K. corporate watchdog Rights and Accountability in Development (RAID) and DRC-based Centre d'Aide Juridico-Judiciaire (CAJJ), reported in 2021 that KCC was intentionally employing subcontractors to avoid paying workers a living wage.[61] RAID and CAJJ used the

---

[57] RAID, *The Road to Ruin? Electric Vehicles and Workers' Rights Abuses at DR Congo's Industrial Cobalt Mines* 65 (2021), https://raid-uk.org/wp-content/uploads/2023/03/report_road_to_ruin_evs_cobalt_workers_nov_2021.pdf [hereinafter Raid, *The Road to Ruin?*].

[58] U.S. Dep't of Labor, *2024 List of Goods Produced by Child or Forced Labor* 32–33 (2024), https://www.dol.gov/sites/dolgov/files/ILAB/child_labor_reports/tda2023/2024-tvpra-list-of-goods.pdf.

[59] *DRC: Investigations Reveal Poor Working Conditions at the Kamoto Copper Company, with Glencore's Comments*, Bus. & Hum. Rts. Res. Ctr. (Feb. 15, 2022), https://www.business-humanrights.org/en/latest-news/drc-investigations-reveal-poor-working-conditions-at-the-kamoto-copper-company-with-glencores-comments/.

[60] Maddie Stone, *The EV Boom Is Being Fueled by Underpaid, Underfed Cobalt Miners*, Verge (Feb. 15, 2022), https://www.theverge.com/2022/2/15/22933022/cobalt-mining-ev-electriv-vehicle-working-conditions-congo.

[61] *See* RAID, *The Road to Ruin?*, *supra* note 58, at 31–35. The ILO defines a living wage as "the wage level that is necessary to afford a decent standard of living for workers and their families, taking into account the country circumstances and calculated for the work performed during the normal hours of work." *See* ILO, *Adopted Conclusions for the Meeting of Experts on Wage Policies, Including Living Wages*, at 3, ILO Doc. MEWPLW/2024/7 (Mar. 14, 2024), https://www.ilo.org/resource/adopted-conclusions.

Minimum Expenditure Basket (MEB) methodology to calculate that the 2021 living wage in Kolwezi, DRC, was $402 USD per month.[62]

77.     The 2021 report found that the average income for KCC's subcontractors was $259 USD per month[63] and that 44% of KCC's workforce consisted of subcontractors who worked for an average of two to three years—far longer than a typical subcontractor.[64]

78.     This year, RAID and CAJJ conducted a follow-up investigation into labor conditions at large, industrial cobalt mines. They noted: "[N]ot a single industrial mine has yet committed to paying the Kolwezi living wage to all their workers, whether directly employed or hired via subcontractors."[65]

79.     CDM conducts mining operations in Kasulo, a formerly populous neighborhood in Kolwezi.[66] The Kasulo mining site allows CDM to rely on an unwaged—often exploited— artisanal labor force, in lieu of employees and heavy machinery.[67]

80.     In 2016, Amnesty International and Afrewatch (a DRC-based NGO) identified CDM as one of the largest single buyers of artisanal cobalt in the DRC.[68] They bought cobalt from buying houses that knowingly and consciously disregarded the fact that it was mined with child labor and under hazardous working conditions.[69]

---

[62] RAID, *The Road to Ruin? Electric Vehicles and Workers' Rights Abuses at DR Congo's Industrial Cobalt Mines* annex 1 (2021), https://raid-uk.org/wp-content/uploads/2023/04/final_annex_1.pdf.
[63] RAID, *The Road to Ruin?*, *supra* note 58, at 33.
[64] *Id*. at 26.
[65] *'No Excuse for Poverty Pay': NGOs Call Out Mining Companies During DRC Mining Week 2025*, RAID (June 10, 2025), https://raid-uk.org/drc-kolwezi-living-wage-mine-workers-rights-2025/.
[66] Filipe Calvão et al., *Cobalt Mining and the Corporate Outsourcing of Responsibility in the Democratic Republic of Congo*, 8 Extractive Industries & Soc. 1, 4 (2021); Bloomberg News, *Digging for Cobalt Riches: Congo Races to Fix a Deadly Problem*, MINING.COM (Mar. 28, 2018), https://www.mining.com/web/digging-cobalt-riches-congo-races-fix-deadly-problem/.
[67] Calvão et al., *supra* note 67, at 4.
[68] AfreWatch & Amnesty Int'l, *supra* note 57, at 50.
[69] *Id.* at 50-51.

81.    Such exploitative practices continue to this day. For instance, a 2023 study by the U.S. Department of Labor found that 60% of respondents living near the Kasulo mine experienced forced labor.[70] An audit report of CDM noted that workers performing hazardous labor did not have the proper protective equipment.[71]  Workers did not "wear safety goggles," "miners [did not] wear safety boots and helmet[s]," and "miners [wore] slippers at site."[72]

82.    The mine's tunnels contain dangerously low oxygen levels and are at increased risk of collapse.[73] Workers often go on strike to protest working conditions and low pay; their bosses often summon police in response.[74] As one worker described, "[The police] know they will get a gift from the Chinese, so they will threaten you with teargas and batons."[75]

83.    CDM officials have also physically abused their workers: in one video, a semi-naked man, lying in the mud with his hands bound, is beaten while a Mandarin-speaking man yells, "Beat!"[76]

84.    Physical abuse is not limited to CDM. Sicomines managers frequently slap, kick, beat, and violently abuse their employees, especially when workers refuse to carry out unsafe tasks or are unable to understand instructions in Mandarin.[77] Workers at TFM also report being kicked,

---

[70] U.S. Dep't of Labor, *Forced Labor in Cobalt Mining in the Democratic Republic of the Congo: Final Report*, at 22 (May 30, 2023), https://www.dol.gov/sites/dolgov/files/ILAB/DRC-FL-Cobalt-Report-508.pdf.
[71] DNV GL Bus. Assurance Korea, *Audit Report on Congo Dongfang International Mining Sarl.* 23 (2018), https://www.lgchem.com/asset/doc/Audit_Report_CDM_2018.pdf.
[72] *Id.*
[73] Dorothée Baumann-Pauly, *Making Mining Safe and Fair: Artisanal Cobalt Extraction in the Democratic Republic of the Congo*, World Econ. Forum 11 (2020), https://www3.weforum.org/docs/WEF_Making_Mining_Safe_2020.pdf.
[74] Nicolas Niarchos, *The Dark Side of Congo's Cobalt Rush*, New Yorker (May 24, 2021), https://www.newyorker.com/magazine/2021/05/31/the-dark-side-of-congos-cobalt-rush; *In Numbers: Critical Mineral Production, Ownership, and Social Unrest*, Global Witness, https://www.globalwitness.org/en/campaigns/natural-resource-governance/numbers-critical-mineral-production-ownership-and-social-unrest/ (last visited Aug. 15, 2025).
[75] Niarchos, *supra* note 75.
[76] *Id.*
[77] RAID, *The Road to Ruin?*, *supra* note 58, at 47.

flogged, beaten, and verbally abused by their managers.[78] The same 2023 Labor Department study referenced above found high rates of forced labor among workers living near the TFM mine.[79]

85.    CDM also operates the Kamilombe mining site in Kolwezi. Kamilombe functions as a large, informal artisanal mining site: access is open and unregulated, and only hazardous pits are available for miners to reach mineral ore-rich deposits.[80] Children were reported working at Kamilombe as recently as 2021.[81]

### 2) Tesla's Suppliers Destroy Their Surrounding Environments.

86.    Glencore's mines have contaminated land and water surrounding its operations, significantly harming human health. In 2017, a pipeline connected to MUMI's processing plant burst and released acid into the nearby Luakusha river and Kando lake.[82] This spill destroyed nearby crops and agriculture, and it "decimated several plants and aquatic species" in the Luakusha river.[83] As recently as 2024, local residents vividly described the severe skin conditions and lost livelihood they experienced as a result of this event.[84]

87.    KCC has also been accused of "pumping pure acid into the [neighboring] river, rendering the water . . . unsafe to drink" and "unusable for washing and irrigation."[85] KCC also polluted nearby water bodies with unsafe concentrations of cobalt and copper which exceeded the

---

[78] *Id.*
[79] U.S. Dep't of Labor, *supra* note 71, at 22.
[80] Calvão et al., *supra* note 67, at 5.
[81] Save the Children, *Opportunities for Businesses to Promote Child Rights in Cobalt Artisanal and Small-Scale Mining* 39 (2021), https://www.childrights-business.org/public/uploads/files/20211208/Opportunities%20for%20Businesses%20to%20Promote%20Child%20Rights%20in%20Cobalt%20ASM_2021%20Study.pdf.
[82] RAID & AfreWatch, *Beneath the Green: A Critical Look at the Cost of Industrial Cobalt Mining in the DRC* 41 (Mar. 27, 2024), https://raid-uk.org/wp-content/uploads/2024/03/Report-Beneath-the-Green-DRC-Pollution-March-2024.pdf.
[83] *Id.*
[84] *Id.* at 41–42.
[85] Emma Slater, *Digging the Dirt: Glencore Linked to Alleged 'Child Labour'*, Bureau of Investigative Journalism (Apr. 16, 2012), https://www.thebureauinvestigates.com/stories/2012-04-16/digging-the-dirt-glencore-linked-to-alleged-child-labour/; *see* Chantal Peyer et al., *PR or Progress? Glencore's Corporate Responsibility in the Democratic Republic of the Congo* 9–10 (June 2014), https://raid-uk.org/wp-content/uploads/2023/03/glencore-report-June2014.pdf.

World Health Organization's thresholds for drinking water.[86] Cobalt concentrations were 53 times higher than WHO limitations.[87]

88.     In 2021, one of KCC's tanks containing sulfuric acid burst, spilling acid into farmlands and into the local Luilu, Musonoie, and Kanamwanfwe rivers.[88] The rupture damaged communities' crops and fish farms, and "[s]everal persons suffered burns after entering in contact with the polluted water."[89] KCC's water contamination over the past decade has led to many human health issues for communities surrounding the mine that persist to the present day, including women's health issues, miscarriages, birth defects, skin diseases, and gastrointestinal issues.[90]

89.     CDM has also contributed to "[e]nvironmental degradation and toxic exposures" in the surrounding Kasulo region, which has harmed human health.[91] One study found that inhabitants of Kasulo, particularly children, "were heavily contaminated by cobalt," posing a risk to the heart, lungs, blood, and thyroid.[92]

90.     In 2024, residents living near a CDM processing plant in Lukuni Gare reported that the plant was leaking toxic gas.[93] Community leaders and activists described the air as difficult to breathe and reported that the toxic air has burned fields and caused health issues for local

---

[86] Chantal Peyer et al., *supra* note 86, at 9–10 (June 2014).
[87] *Id.*
[88] *Beneath the Green*, *supra* note 83, at 40.
[89] *Id.* at 48.
[90] *Id.* at 32–36, 41–43.
[91] Célestin Banza Lubaba Nkulu et al., *Sustainability of Artisanal Mining of Cobalt in DR Congo*, 1 Nature Sustainability 495 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6166862/.
[92] *Id.*
[93] *Lukuni Gare : Comment CDM, une Société Minière Chinoise, Pollue l'air Près de Lubumbashi*, Bus. & Hum. Rts. Res. Ctr. (Nov. 10, 2024), https://www.business-humanrights.org/en/latest-news/lukuni-gare-comment-cdm-une-soci%C3%A9t%C3%A9-mini%C3%A8re-chinoise-pollue-lair-pr%C3%A8s-de-lubumbashi/.

residents.[94] They stated that CDM has refused to take concrete measures to minimize its environmental impact.[95]

91.    The same year, TFM evicted 1,500 households from the Manomapia neighborhood and nearly 1,000 residents from the Kabombwa village, both located near the large mining concession.[96] These evictions came after eleven Kabombwa residents died from river pollution caused by TFM's lime production plant, and at least ten Manomapia residents—including children under the age of five—died from air pollution caused by TFM's copper processing plant.[97] Residents of these communities have complained of health problems, destroyed livelihoods, and insufficient compensation for their evictions.[98]

92.    Years of mining on behalf of tech companies has created an "environmental catastrophe" in the DRC.[99] Companies like Tesla have made technological advancements at the expense of the DRC's human rights, environment, and health. Congolese people "are not driving EVs nor enjoying a healthy environment. Instead, they are plagued by water pollution that's making them sicker and poorer."[100]

### 3) Tesla's Suppliers Leverage Armed Security Forces that Kill and Grievously Injure Surrounding Community Members.

---

[94] *Id.*

[95] *Id.*

[96] Didier Makal, *Impunity and Pollution abound in DRC Mining Along the Road to the Energy Transition,* Mongabay (May 14, 2024), https://news.mongabay.com/2024/05/impunity-and-pollution-abound-in-drc-mining-along-the-road-to-energy-transition/; *DRC: Families Displaced Due to Pollution Caused by Mining*, RFI (May 18, 2024), https://www.rfi.fr/fr/afrique/20240511-rdc-fungurume-tfm-familles-d%C3%A9plac%C3%A9es-pollution-exploitation-mini%C3%A8re; Constance, *TFM Mining Destroys the Environment in Manomapia Causing Water and Air Pollution*, Copperbelt Katanga Mining (Apr. 28, 2024), https://copperbeltkatangamining.com/tfm-mining-destroys-the-environment-in-manomapia-causing-water-and-air-pollution/.

[97] Makal, *supra* note 97; Constance, *supra* note 97.

[98] *Id.*

[99] *From Cobalt to Cars: How China Exploits Children and Forced Labor in DR Congo: Hearing Before the Cong.-Exec. Comm'n on China*, 118th Cong. 15 (2023) (statement of Nicolas Niarchos, Freelance Journalist), https://www.congress.gov/event/118th-congress/joint-event/LC72512/text.

[100] Alex Shaw, *Global Cobalt Rush Drives Toxic Toll Near DRC Mines*, Mongabay (Mar. 27, 2024), https://news.mongabay.com/2024/03/global-cobalt-rush-drives-toxic-toll-near-drc-mines/.

93.    Glencore relies on internal staff, private security contractors, and Congolese police and military forces to secure their KCC and MUMI sites.[101] Mine police routinely fire live ammunition at artisanal miners on their sites, killing or seriously injuring them and residents living nearby.[102]

94.    After 43 artisanal miners died during a tunnel collapse on KCC grounds in 2019, soldiers from the DRC armed forces (*Forces Armées de la République Démocratique du Congo*, "FARDC") were deployed to disperse thousands of artisanal miners on the site.[103] Glencore denied requesting the army's deployment but acknowledged that soldiers remained present at the KCC perimeter following the incident.[104]

95.    Since then, FARDC soldiers have collaborated with KCC security officials, private security contractors, and mine police to arbitrarily detain and torture local residents mistaken for artisanal miners.[105] Victims as young as twelve-years-old described being bitten by guard dogs, locked in the KCC dungeon for days, and threatened with death if they failed to pay military officials.[106]

96.    KCC security personnel continue to terrorize residents in the surrounding communities. As one woman from Musonoï recently described:

> "They chase [unemployed youth] from the mining sites. They shoot at them at any moment. We are even afraid to let our children walk in the streets for fear of them being arrested like the diggers. Finally, a woman was struck by a bullet, and we

---

[101] Chantal Peyer et al., *supra* note 86, at 10.

[102] *Id.*

[103] Aaron Ross, *Send in the Troops: Congo Raises the Stakes on Illegal Mining*, Reuters (July 17, 2019), https://www.reuters.com/article/world/send-in-the-troops-congo-raises-the-stakes-on-illegal-mining-idUSKCN1UC0C9/.

[104] Amensty Int'l, *DRC: Crisis in Mines Requires Sustainable Solution* (2019), AI Index AFR 62/0772/2019, https://www.amnesty.org/en/documents/afr62/0772/2019/en/.

[105] Afrewatch, *Private Security Companies and Human Rights in the Provinces of Haut-Katanga and Lualaba: Analysis of the Legal Framework and Overview of the Human Rights Situation* 19–21 (2021), https://afrewatch.org/wp-content/uploads/2021/06/AFREWATCH_Rapport-detude-PVSDH_Juin-2021.pdf.

[106] *Id.*

don't know if she is dead or alive. There is too much gunfire. We wonder if there is war in the Musonoyi village."[107]

97.    TFM has also relied on the FARDC, private security personnel, and DRC mining police to maintain security at its concession.[108] In 2017, a minor girl residing on the concession was gang raped by private security contractors and mine police.[109] The same year, five women married to artisanal miners and residing on the TFM concession were gang raped by FARDC soldiers and mine police.[110]

98.    In 2019, CMOC repeatedly requested military forces to clear nearly 10,000 people, some of whom lived on the concession.[111] Afrewatch reported that soldiers fired live ammunition to disperse artisanal miners, killing three, and destroyed housing and shelters in two villages.[112] Days later, the army torched market stalls and dozens of homes, severely burning a three-year-old girl and a one-year-old baby boy who were caught in their homes.[113]

99.    Between 2018 and 2021, FARDC and TFM guards seriously injured or killed nearly a dozen artisanal miners and community residents, including a ten-year-old boy.[114] These victims were shot, often at point-blank range, or struck by TFM guard vehicles when attempting to leave the site.[115]

### 4) Tesla's Suppliers Maintain Their Operations through Corruption, Money Laundering, and Tax Evasion.

---

[107] Friends of the Congo, *Glencore in the D.R. Congo: Community Testimony*, YouTube (May 25, 2024), https://www.youtube.com/watch?v=xuItDoFHQoI&t=110s.

[108] *Training for Tenke Fungurume Mining (TFM) on the Voluntary Principles*, Geneva Ctr. for Security Sector Governance (Nov. 4, 2022), https://www.securityhumanrightshub.org/news/training-for-tenke-fungurume-mining.html.

[109] Afrewatch, *Private Security Companies and Human Rights*, *supra* note 106, at 25.

[110] *Id.* at 25–26.

[111] OECD, *supra* note 6, at 41–42.

[112] Fiston Mahamba & Aaron Ross, *Illegal Miners Defy Eviction from Glencore's Congo Project*, Reuters (July 2, 2019), https://www.reuters.com/article/business/illegal-miners-defy-eviction-from-glencore-s-congo-project-idUSKCN1TX1IU/; Afrewatch, *Private Security Companies and Human Rights*, *supra* note 106, at 22–25

[113] Ross, *supra* note 104.

[114] Afrewatch, *Private Security Companies and Human Rights*, *supra* note 106, at 22–25.

[115] *Id.*

100.    From 2002–2012, Israeli businessman Dan Gertler obtained copper-cobalt assets that became the largest cobalt-producing operations in the world.[116] He was sanctioned by the United States in 2017 for using his "close friendship with DRC President Joseph Kabila to act as a middleman for mining asset sales in the DRC."[117]

101.    Glencore paid Gertler an estimated $74 million in royalties in 2018, despite sanctions against him.[118] Since then, Glencore has been under investigation for bribery and money laundering by the United States Department of Justice, the Commodity Futures Trading Commission, the United Kingdom Serious Fraud Office ("UK SFO"), and the Office of the Attorney General of Switzerland ("Swiss OAG").[119] Sicomines also maintained business relationships with and made payments to customs and logistics agencies controlled by Gertler after he came under sanctions.[120]

102.    Glencore pled guilty to the DOJ's bribery charges in 2022, and the company was convicted by the Swiss OAG in 2024.[121] In 2024, DRC tax authorities fined KCC $894 million for unpaid royalties, freezing the company's bank accounts and sealing off one of its storage warehouses as a result.[122]

---

[116] Gulley, *supra* note 2, at 7.

[117] *United States Sanctions Human Rights Abusers and Corrupt Actors Across the Globe*, U.S. Dep't Treasury (Dec. 21, 2017), https://home.treasury.gov/news/press-releases/sm0243.

[118] OECD, *supra* note 6, at 45.

[119] RAID, *The Road to Ruin?*, *supra* note 58, at 18; Guillaume de Brier, *IPIS Briefing March 2020 – Cobalt: Concerns over Child Labour in Artisanal Mining Should Not Overshadow the Corruption in Large Scale Mining*, IPIS (Apr. 6, 2020), https://ipisresearch.be/nl/weekly-briefing/ipis-briefing-march-2020-cobalt-concerns-child-labour-artisanal-mining-not-overshadow-corruption-large-scale-mining/.

[120] *Undermining Sanctions*, Global Witness (June 2, 2020), https://globalwitness.org/en/campaigns/corruption-and-money-laundering/undermining-sanctions/.

[121] *After Criminal Complaint by Public Eye: Glencore Convicted Following Corrupt Mine Deals in the DRC*, Public Eye (Aug. 22, 2024), https://www.publiceye.ch/en/topics/commodities-trading/after-criminal-complaint-by-public-eye-glencore-convicted-following-corrupt-mine-deals-in-the-drc.

[122] Bloomberg News, *Glencore Congo Copper Mine Hit with $894 Million Royalty Row*, MINING.COM (Sept. 27, 2024), https://www.mining.com/web/glencore-congo-copper-mine-hit-with-e800-million-royalty-row/.

103.    Glencore uses "transfer pricing" to shift profits between subsidiaries, in order to take advantage of low- or no-tax jurisdictions.[123] KCC ran at a loss of hundreds of millions of dollars per year from 2009 to 2013, while Glencore's Canadian subsidiary (Katanga Mining Limited) ran at a net profit of $400 million.[124] This resulted in a $150 million revenue loss for the DRC.[125]

104.    CMOC has been accused of under-reporting mineral reserves associated with the TFM mine and owing the government $7.6 billion in overdue royalty payments.[126] In 2023, CMOC settled the matter with Congolese authorities to the tune of $2 to $3 billion.[127]

**B.  Tesla Is Misleading Reasonable Consumers in the District.**

105.    Tesla's representations—such as claiming its Products are responsibly sourced and free from human rights abuses—are false and inherently misleading to D.C. consumers, who care deeply about the ethics and environmental impact of the Products they purchase for their families and communities.

106.    Reasonable D.C. consumers encountering Tesla's representations would not expect Tesla's supply chain to involve minerals linked to unfair labor practices, forced labor, human rights abuses, or environmental harm. By marketing its vehicles as responsibly and ethically sourced, Tesla gives consumers no reason to question or investigate the underlying sources of critical minerals such as cobalt. Consumers are not equipped with the tools or access necessary to

---

[123] Ben Radley, *Why Mining Execs Don't Care if Congo Hikes Up Its Profit Tax*, Afr. Arguments (Mar. 29, 2018), https://africanarguments.org/2018/03/why-mining-execs-dont-care-if-congo-increases-its-profit-tax-mining-code/.
[124] *Id.*
[125] *Id.*
[126] Bloomberg News, *One of World's Biggest Cobalt Mines Is at Stake in Congo Fight*, MINING.COM (June 23, 2022), https://www.mining.com/web/one-of-worlds-biggest-cobalt-mines-is-at-stake-in-congo-fight/.
[127] *Congo State Miner and China's CMOC Reach Agreement on Royalties*, Reuters (Apr. 25, 2023), https://www.reuters.com/markets/commodities/congo-state-miner-chinas-cmoc-reach-agreement-royalties-2023-04-25/.

independently verify the origins of these materials—they must, and do, rely on Tesla's representations, which Tesla knows and uses to its advantage.

107.    Regarding environmental claims in particular, the Federal Trade Commission has released "Green Guides" that caution marketers not to make unqualified general environmental benefit claims because "it is highly unlikely that marketers can substantiate all reasonable interpretations of these claims."[128] Tesla cannot substantiate sweeping claims that its sourcing of minerals is environmentally responsible or conflict-free, especially in light of documented ties to suppliers engaged in exploitative labor and environmental degradation. These statements mislead D.C. consumers into believing Tesla's sourcing practices are more ethical and sustainable than they truly are.

108.    Nothing in Tesla's marketing materials, website, or product labeling alerts reasonable D.C. consumers to the risks and realities associated with the company's mineral sourcing practices. Tesla knows the claims it makes and understands that consumers—including those in the District—rely on those claims when deciding whether to purchase its Products. Tesla is fully aware of how its supply chain operates and knows, or should know, that its representations about ethical and sustainable sourcing are false and misleading.

109.    Tesla also knows that consumer preference is increasingly driven by concerns for human rights, labor conditions, and sustainability. While proof of consumer reliance is not required under the CPPA, Tesla's knowledge of consumer expectations—and intent to appeal to those expectations through deceptive marketing—is relevant. Tesla made and continues to make these false and misleading representations to increase its profits—at the expense of consumers' rights to make informed, ethical purchasing decisions.

---

[128] 16 C.F.R. § 260.4(b) (2012). Relatedly, the CPPA states that "when construing the term 'unfair or deceptive trade practice,'" deference should be given to "interpretation by the [FTC]." *See* D.C. Code § 28-3901(d).

110.    D.C. consumers face real, immediate, and ongoing harm if Tesla continues to misrepresent and conceal the truth about how it sources the minerals in its Products.

## CAUSE OF ACTION

### *Violations of the District of Columbia Consumer Protection Procedures Act*

111.    IRAdvocates incorporates by reference all the allegations of the preceding paragraphs of this Complaint.

112.    IRAdvocates is a nonprofit, public interest organization that brings this action on behalf of the general public and District consumers. *See* D.C. Code § 28-3905(k)(1)(D)(i).

113.    Through D.C. Code § 28-3905(k)(1)(D)(i), the CPPA explicitly allows for public interest organizational standing even beyond that which is afforded pursuant to D.C. Code § 28-3905(k)(1)(C). It allows a public interest organization to stand in the shoes of consumers to seek relief for any violation of the CPPA, which encompasses the presence of misleading marketing information in the District.

114.    Tesla is a "person" and a "merchant" that provides and markets "goods" within the meaning of the CPPA. *See id*. § 28-3901(a)(1), (3), (7).

115.    Tesla represents that it responsibly sources the minerals used in its Products, including that it upholds fair labor standards and ensures the ethical treatment of people in its supply chain; sources minerals free from corruption and forced labor; and is dedicated to protecting human rights and the environment. In reality, Tesla's mineral supply-chain is riddled with corruption, environmental destruction, and human rights abuses.

116.    Tesla has violated the CPPA by "represent[ing] that goods . . . have a source, sponsorship, approval . . . [or] characteristics . . . that they do not have"; "represent[ing] that goods . . . are of a particular standard, quality, grade, style, or model, [when] in fact they are of

another"; "misrepresent[ing] as to a material fact which has a tendency to mislead"; "fail[ing] to

state a material fact [when] such failure tends to mislead"; "us[ing] innuendo or ambiguity as to a

material fact, which has a tendency to mislead"; and "advertis[ing] . . . goods . . . without the intent

to sell them as advertised." See *id*. § 28-3904(a), (d), (e), (f), (f-1), (h).

### JURY TRIAL DEMAND

117.    IRAdvocates hereby demands a trial by jury.

### PRAYER FOR RELIEF

Wherefore, IRAdvocates prays for judgment against Tesla and requests the following

relief:

A.    A declaration that Tesla's conduct is in violation of the CPPA;

B.    An order enjoining Tesla's conduct found to be in violation of the CPPA;

C.    An order granting IRAdvocates' costs and disbursements, including reasonable
attorneys' fees and expert fees, and prejudgment interest at the maximum rate
allowable by law; and

D.    Any such other relief as the Court deems authorized, reasonable, and just.

DATED: August 19, 2025                    Respectfully submitted,

*/s/ Terrence Collingsworth*
Terrence Collingsworth (DC Bar 471830)
E-mail: tc@iradvocates.org

*/s/ Olamide Abiose*\*
Olamide Abiose
E-mail: olamide@internationalrightsadvocates.org

**INTERNATIONAL RIGHTS ADVOCATES**
621 Maryland Ave NE Washington, D.C. 20002
Tel: 202-543-5811

*\*Pro Hac Vice Admission Pending*

# EXHIBIT 8

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

INTERNATIONAL RIGHTS ADVOCATES,
_____
                                          Plaintiff
                    vs.

                                                    Case Number    2025-CAB-005515
TESLA, INC.,
_____
                                          Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Terrence Collingsworth
_____
Name of Plaintiff's Attorney

INTERNATIONAL RIGHTS ADVOCATES
_____
Address
621 Maryland Ave NE Washington, D.C. 20002

2025435811
_____
Telephone

_Clerk of the Court_

By _____
                              Deputy Clerk

Date    **August 20, 2025**
_____

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시요        የአማርኛ ትርጉም ለማግኘት (202) 879-4828  ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

**CITATORIO**

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

*SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

Por: _____

_____
Dirección                                            Subsecretario

_____

Fecha _____
_____
Teléfono

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 전화주십시오     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

# EXHIBIT 9



**Superior Court of the District of Columbia**
**Civil Division - Civil Actions Branch**
**500 Indiana Ave NW, Room 5000, Washington DC 20001**
**202-879-1133 | www.dccourts.gov**

**Case Number:** 2025-CAB-005515

**Case Style:** International Rights Advocates v. Tesla, Inc

**INITIAL ORDER**

| Initial Hearing Date: | Initial Hearing Time: | Courtroom Location: |
|---|---|---|
| Friday, 11/21/2025 | 9:30 AM | Remote Courtroom 517 |

**Please see attached instructions for remote participation.**

Your case is assigned to Associate Judge Leslie A Meek.

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby ORDERED as follows:

1) This case is assigned to the judge and calendar designated above. All future filings in this case shall bear the calendar number and judge's name along with the case number in the caption.

2) Within 60 days of the filing of the complaint, plaintiff must file proof of service on each defendant of copies of the summons, the complaint, and this Initial Order. The court will dismiss the claims against any defendant for whom such proof of service has not been filed by this deadline, unless the court extended the time for service under Rule 4.

3) Within 21 days of service (unless otherwise provided in Rule 12), each defendant must respond to the complaint by filing an answer or other responsive pleading. The court may enter a default and a default judgment against any defendant who does not meet this deadline, unless the court extended the deadline under Rule 55(a).

4) At the time stated above, all counsel and unrepresented parties shall participate in a hearing to establish a schedule and discuss the possibilities of settlement. Counsel shall discuss with their clients before the hearing whether the clients are agreeable to binding or non-binding arbitration. This order is the only notice that parties and counsel will receive concerning this hearing.

5) If the date or time is inconvenient for any party or counsel, the Civil Actions Branch may continue the Conference once, with the consent of all parties, to either of the two succeeding days when the calendar is called. To reschedule the hearing, a party or lawyer may call the Branch at (202) 879-1133. Any such request must be made at least seven business days before the scheduled date. No other continuance will be granted except upon motion for good cause shown.

6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

Chief Judge Milton C. Lee, Jr.

**To Join by Computer, Tablet, or Smartphone:**

1) Copy and Paste or Type the link into a web browser and enter the Webex Meeting ID listed below.

   Link: dccourts.webex.com/meet/ctb517

   Meeting ID: 129 911 6415

2) When you are ready, click "Join Meeting".
3) You will be placed in the lobby until the courtroom clerk gives you access to the hearing.


**Or to Join by Phone:**

1) Call 202-860-2110 (local) or 844-992-4726 (toll-free)
2) Enter the Webex Meeting ID listed above followed by "##"


**Resources and Contact Information:**

1) For best practices on how to participate in Webex Meetings, click here https://www.webex.com/learn/best-practices.html.
2) For technical issues or questions, call the Information Technology Division at 202-879-1928 and select option 2.
3) For case questions, call the Civil Actions Branch Clerk's Office at 202-879-1133.
4) To change your method of hearing participation, visit www.dccourts.gov/hearing-information for instructions and forms.

## ACCESSIBILITY AND LANGUAGE ACCESS

**Persons with Disabilities:**

If you have a disability as defined by the American Disabilities Act (ADA) and you require an accommodation, please call 202-879-1700 or email ADACoordinator@dcsc.gov. The D.C. Courts does not provide transportation service.

**Interpreting and Translation Services:**

The D.C. Courts offers free language access services to people having business with the court who are deaf or who are non-English speakers. Parties to a case may request free translations of court orders and other court documents. To ask for an interpreter or translation, please contact the Clerk's Office listed for your case. For more information, visit https://www.dccourts.gov/language-access.

**Servicios de interpretación y traducción:**

Los Tribunales del Distrito de Columbia ofrecen servicios gratuitos de acceso al idioma a las personas sordas o que no hablan inglés que tienen asuntos que atender en el tribunal. Las partes de un caso pueden solicitar traducciones gratuitas de las órdenes judiciales y otros documentos del tribunal. Para solicitar un intérprete o una traducción, póngase en contacto con la Secretaría de su caso.

Para más información, visite https://www.dccourts.gov/language-access.

El acceso al idioma es importante para los Tribunales del Distrito de Columbia. Puede dar su opinión sobre los servicios de idiomas visitando https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access.

**የቃልና የጽሑፍ ትርጓሜ አገልግሎቶች:**

የዲ.ሲ. ፍርድ ቤቶች መስማት ለተሳናቸውና የእንግሊዝኛ ቋንቋ ተናጋሪ ላልሆኑ በፍርድ ቤቱ ጉዳይ ላላቸው ሰዎች ነጻ የቋንቋ ተደራሽነት አገልግሎቶች ያቀርባል። ተከራካሪ ወገኖች የፍርድ ቤት ትእዛዞችና ሌሎች የፍርድ ቤት ሰነዶች በነጻ እንዲተረጎሙላቸው መጠየቅ ይችላሉ። የቃል ወይም የጽሑፍ ትርጓሜ ለመጠየቅ እባክዎን በመዝገብዎ የተዘረዘረውን የጸሐፊ ቢሮ (ክለርክ'ስ ኦፊስ) ያናግሩ። ለተጨማሪ መረጃ https://www.dccourts.gov/language-access ይጎብኙ።

የቋንቋ ተደራሽነት ለዲ.ሲ. ፍርድ ቤቶች አስፈላጊ ነው። የቋንቋ አገልግሎቶች በተመለከተ አስተያያትዎን https://www.dccourts.gov/services/information-and-resources/interpreting-services#language-access በመጎብኘት መስጠት ይችላሉ።

# Tips for Attending Remote Hearings - Civil Division

*Your court hearing may be held remotely. This means that you will participate by phone or by video conference instead of coming to the courthouse. Here are some tips on how to prepare.*

## How do I know if I have a remote hearing?

The Court will contact you to tell you that your hearing is remote. They may contact you by sending you an email, letter in the mail, or by calling you.



## How do I take part in a remote hearing?

The Court will give you step-by-step instructions on how to take part in the remote hearing.

If you lose your written notice, call the Civil Actions Clerk's Office for instructions at:

 202-879-1133

## Is there anything that I should do before the day of the hearing?

- Let the court know immediately if you cannot join a hearing because you do not have a phone or computer.

   Civil Actions Clerk's Office: 202-879-1133

- You may want to contact an attorney for legal help.
- You can also find the list of legal services providers at www.dccourts.gov/services/represent-yourself by clicking on the link that says, "List of Legal Service Providers for Those Seeking an Attorney or Legal Advice".
- Evidence: if you want the judge to review photos or documents, ask the judge how to submit your evidence.
- Witnesses: tell the judge if you want a witness to testify at your hearing.
- Accommodations & Language Access: let the court know if you need an interpreter or other accommodation for your hearing.

## Tips for the Hearing



- Join the hearing a few minutes early!
- Charge your computer or phone and make sure you have enough minutes to join the call. Find a private and quiet space. If possible, be alone in a room during the hearing. Try to limit distractions as much as possible. If others are in the room with you, ask if they can be quiet during the hearing.
- Mute your microphone when you are not talking. Mute all sounds on your phone or computer.
- Say your name before you speak so the record  is clear. Be prepared to identify your role in the hearing (e.g., observer, plaintiff, defendant, witness, etc.).
- Speak slowly and clearly so everyone hears what you are saying.
- Pause before speaking in case there is a lag. Use a headset or headphones if you can. This will free up your hands and sound better.
- Try not to talk over anyone else. Only one person can speak at a time. If you talk while someone else is talking, the judge will not be able to hear you.
- Have all your documents for the hearing in front of you. Have a pen and paper to take notes.
- If you are not ready for your hearing or want to speak with an attorney, you can ask the judge to postpone your hearing for another date.
- If your sound or video freezes during the hearing, use the chat feature or call the Clerk's Office to let them know that you are having technical issues.

## Special Tips for Video Hearings
## (Click here for more information)

- Download the court's hearing software, WebEx, in advance and do a test run! The Court will provide you with a WebEx link in advance of the hearing.
- Set up the camera at eye level. If you are using your phone, prop it up so you can look at it without holding it.
- Look at the camera when you speak and avoid moving around on the video.
- Wear what you would normally wear to court.
- Sit in a well-lit room with no bright lights behind you.
- If possible, find a blank wall to sit in front of. Remember the judge will be able to see everything on your screen, so pick a location that is not distracting.




# District of Columbia Courts

# Tips for Using DC Courts Remote Hearing Sites

The DC Courts have **remote hearing sites** available in various locations in the community to help persons who may not have computer devices or internet service at home to participate in scheduled remote hearings. The Courts are committed to enhancing access to justice for all.

There are four remote access sites throughout the community which will operate **Monday – Friday, 8:30 am – 4:00 pm.**

| **Remote Site – 1** |
| --- |
| Balance and Restorative Justice Center<br>1215 South Capitol Street, SW<br>Washington, DC 20003 |

| **Remote Site – 3** |
| --- |
| Balance and Restorative Justice Center<br>118 Q Street, NE<br>Washington, DC 20002 |



| **Remote Site – 2** |
| --- |
| Balance and Restorative Justice Center<br>1110 V Street, SE<br>Washington, DC 20020 |

| **Remote Site – 4** |
| --- |
| Balance and Restorative Justice Center<br>920 Rhode Island Avenue, NE<br>Washington, DC 20018 |

**If you want to use a remote site location for your hearing**, call 202-879-1900 or email DCCourtsRemoteSites@dcsc.gov at least 24 hours before your hearing to reserve a remote access computer station.

**If you require special accommodations such as an interpreter for your hearing**, please call 202-879-1900 at least 24 hours in advance of your hearing so the Courts can make arrangements.

**\*You should bring the following items when you come to your scheduled site location\***

1. Your case number and any hyperlinks provided by the Courts for your scheduled hearing.
2. Any documents you need for the hearing (evidence), including exhibits, receipts, photos, contracts, etc.
3. Materials for notetaking, including pen and paper.

\*Safety and security measures are in place at the remote sites.

**Contact information to schedule your remote access computer station:**
Call:  202-879-1900
Email:  DCCourtsRemoteSites@dcsc.gov




# Tribunales del Distrito de Columbia
## Consejos para usar los sitios de audiencia remota de los Tribunales de DC

Los Tribunales de DC disponen de **sitios de audiencia remota** en distintos centros de la comunidad para ayudar a que las personas que no tienen dispositivos informáticos o servicio de Internet en su casa puedan participar en audiencias remotas programadas. Los Tribunales honran el compromiso de mejorar el acceso de toda la población a la justicia.

En toda la comunidad hay cuatro sitios de acceso remoto que funcionarán **de Lunes a Viernes, de 8:30 am a 4:00 pm**.

| | |
|---|---|
| **Sito Remoto – 1**<br><br>Balance and Restorative Justice Center<br>1215 South Capitol Street, SW<br>Washington, DC 20003 | **Sito Remoto – 3**<br><br>Balance and Restorative Justice Center<br>118 Q Street, NE<br>Washington, DC 20002 |
| **Sito Remoto – 2**<br><br>Balance and Restorative Justice Center<br>1110 V Street, SE<br>Washington, DC 20020 | **Sito Remoto – 4**<br><br>Balance and Restorative Justice Center<br>920 Rhode Island Avenue, NE<br>Washington, DC 20018 |



**Si desea usar un sitio remoto para su audiencia**, llame al 202-879-1900 o envíe un mensaje de correo electrónico a DCCourtsRemoteSites@dcsc.gov al menos 24 horas antes de la audiencia, para reservar una estación de computadora de acceso remoto.

**Si necesita adaptaciones especiales**, como un intérprete para la audiencia, llame al 202-879-1900 al menos 24 horas antes de la audiencia para que los Tribunales puedan hacer los arreglos necesarios.

**\*Cuando concurra al sitio programado debe llevar los siguientes artículos\***
1. Su número de caso y todos los hipervínculos que le hayan proporcionado los Tribunales para la audiencia programada.
2. Cualquier documento que necesite para la audiencia (prueba), incluidos documentos probatorios, recibos, fotos, contratos, etc.
3. Materiales para tomar nota, como papel y lápiz.

\*Los sitios de acceso remoto cuentan con medidas de seguridad y protección.

**Información de contacto para programar su estación de computadora de acceso remoto:**
Teléfono: 202-879-1900
Correo electrónico: DCCourtsRemoteSites@dcsc.gov

# EXHIBIT 10

eFiled
9/19/2025 10:57:05 AM
Superior Court
of the District of Columbia

## AFFIDAVIT OF SERVICE

**District of Columbia**

**Superior Court**

Case Number: 2025-CAB-005515

Plaintiff:
**INTERNATIONAL RIGHTS ADVOCATES**

vs.

Defendant:
**TESLA, INC.**

Received by Scott Pritchard on the 10th day of September, 2025 at 9:06 am to be served on **Tesla, Inc. c/o CT Corporation System, 1999 Bryan St. Ste. 900, Dallas, TX 75201.**

I, Scott Pritchard, being duly sworn, depose and say that on the **15th day of September, 2025** at **8:32 am, I:**

delivered to a **REGISTERED AGENT** a true copy of the **Summons, Complaint, Request to Produce, Request for Admissions, Interrogatories** with the date of service endorsed thereon by me, to: **Tierica Williams, as Intake Specialist**, at the address of: **1999 Bryan St. Ste. 900, Dallas, TX 75201** on behalf of **Tesla, Inc. c/o CT Corporation System**, and informed said person of the contents therein.

I am of sound mind, capable of making this Affidavit. I am over the age of 18 years and I am not a party to this suit and have no interest in the outcome of the suit.

Subscribed and Sworn to before me on the  15  day
of  SEPTEMBER , 2025  by the affiant who is
personally known to me.

NOTARY PUBLIC

**Scott Pritchard**
PSC3703, Exp. 4/30/2026

9/15/25

**Date**

**Veritext**
**633 E. Colonial Drive**
**Orlando, FL 32803**
**(407) 898-4200**

Our Job Serial Number: PTC-2025006484
Ref: 7588892

VALERIE J PRITCHARD
Notary Public, State of Texas
Comm. Expires 10-13-2026
Notary ID 12567451-8

# EXHIBIT 11

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| _____ ) | Case No. 2025 CAB 005515 |
| INTERNATIONAL RIGHTS ADVOCATES ) | |
| ) | (Hon. Leslie A. Meek) |
| Plaintiff, ) | |
| ) | |
| V. ) | |
| ) | |
| ) | |
| TESLA, INC. ) | |
| ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

### RULE 55(a)(3)(B) PRAECIPE REGARDING EXTENSION OF TIME

Plaintiff International Rights Advocates and Defendant Tesla, Inc. hereby agree that

Defendant shall have up to and including October 27, 2025, to file a responsive pleading to the

Complaint filed in this action. Said extension is for not more than twenty-one days from the

original response deadline of October 6, 2025.


Respectfully submitted,


By: */s/David Horniak*                           By: */s/Terrence Collingsworth*
Mary Gately (# 419151)                          Terrence Collingsworth (# 471830)
David Horniak (# 998649)                        Olamide Abiose (*pro hac vice* pending)
**DLA PIPER LLP (US)**                           **INTERNATIONAL RIGHTS ADVOCATES**
500 8th Street, N.W.                            621 Maryland Avenue, N.E.
Washington, D.C. 20004                          Washington, D.C. 20002
(202) 799-4361                                  (202) 7543-5811
mary.gately@us.dlapiper.com                     tc@iradvocates.org
david.horniak@us.dlapiper.com                   olamide@internationalrightsadvocates.org

*Counsel for Defendant Tesla, Inc.*             *Counsel for Plaintiff International Rights*
                                                *Advocates*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 3rd day of October, 2025, I caused a true and correct copy of the foregoing to be served on counsel of record by filing the document with the Court's eFileDC electronic filing system, which will send notification of the filing to all counsel registered within that system.

*<u>/s/David Horniak</u>*

# EXHIBIT 12

Civil Actions

## Case Summary

### Case No. 2025-CAB-005515

| | | | |
|---|---|---|---|
| **International Rights Advocates v. Tesla, Inc** | § | Location: | **Civil Actions** |
| | § | Judicial Officer: | **Meek, Leslie A** |
| | § | Filed on: | **08/19/2025** |

---

### Case Information

| | |
|---|---|
| Case Type: | Statutory Claim |
| Subtype: | Consumer Protection Act |
| Case Status: | **08/19/2025  Open** |

---

### Assignment Information

**Current Case Assignment**
Case Number      2025-CAB-005515
Court            Civil Actions
Date Assigned    08/19/2025
Judicial Officer Meek, Leslie A

---

### Party Information

*Lead Attorneys*

| | | |
|---|---|---|
| **Plaintiff** | **International Rights Advocates**<br>621 Maryland AVE Northeast<br>Washington, DC 20002 | **Collingsworth, Terrence P**<br>***Retained***<br>202-543-5811(W)<br>International Rights Advocates<br>621 Maryland Ave NE<br>Washington, DC 20002<br>tc@iradvocates.org |
| **Defendant** | **Tesla, Inc**<br>1 Tesla RD<br>Austin , TX 78725 | |

---

### Events and Orders of the Court

08/19/2025     Complaint Filed
  Docketed on:   08/20/2025
  Filed by:   Plaintiff International Rights Advocates

08/20/2025     Initial Order [Remote]     (Judicial Officer: Meek, Leslie A)

08/20/2025     Notice

09/19/2025     Affidavit/Declaration of Service of Summons and Complaint
  Docketed On:   09/20/2025
  Filed By:   Plaintiff International Rights Advocates
  Served On:   Defendant Tesla, Inc

10/03/2025     Notice to Court (Praecipe) to Extend Time
  *Rule 55(a)(3)(B) Praecipe Regarding Extension of Time*
  Filed By:   Defendant Tesla, Inc
  —

Civil Actions

## Case Summary

### Case No. 2025-CAB-005515

10/03/2025

Notice to Court (Praecipe) Filed
*Defendant Tesla Inc's Corporation Disclosure's Statement*
Docketed On:   10/06/2025
Filed By:   Defendant Tesla, Inc

11/21/2025

**Remote Initial Scheduling Conference**   (9:30 AM)   (Judicial Officer: Meek, Leslie A)

---

## Financial Information

**Plaintiff**    International Rights Advocates

| | |
|---|---|
| Total Financial Assessment | 120.00 |
| Total Payments and Credits | 120.00 |
| **Balance Due as of 10/11/2025** | **0.00** |

# EXHIBIT 13

## CIVIL COVER SHEET

JS-44 (Rev. 11/2020 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| INTERNATIONAL RIGHTS ADVOCATES | TESLA, INC. |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Washington, D.C. (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Travis, TX (IN U.S. PLAINTIFF CASES ONLY) NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
|---|---|

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Terrence P. Collingsworth<br>Olamide Abiose<br>International Rights Advocates<br>621 Maryland Ave NE<br>Washington, D.C. 20002 | Mary Gately<br>David Horniak<br>DLA Piper LLP (US)<br>500 8th St. NW<br>Washington, D.C. 20004 |

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 3 Federal Question (U.S. Government Not a Party)

○ 2 U.S. Government Defendant

◉ 4 Diversity (Indicate Citizenship of Parties in item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ◉ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ◉ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)**

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))
Other Statutes
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**◉ E. General Civil (Other)**     OR     **○ F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Conditions
☐ 560 Civil Detainee – Conditions of Confinement

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent – Abbreviated New Drug Application
☐ 840 Trademark
☐ 880 Defend Trade Secrets Act of 2016 (DTSA)

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

Other Statutes
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc
☐ 460 Deportation
☐ 462 Naturalization Application

☐ 465 Other Immigration Actions
☐ 470 Racketeer Influenced & Corrupt Organization
☐ 480 Consumer Credit
☐ 485 Telephone Consumer Protection Act (TCPA)
☐ 490 Cable/Satellite TV
☐ 850 Securities/Commodities/ Exchange
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/Privacy Act* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus – General<br>☐ 510 Motion/Vacate Sentence<br>☐ 463 Habeas Corpus – Alien Detainee | ☐ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Labor Railway Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities – Employment<br>☐ 446 Americans w/Disabilities – Other<br>☐ 448 Education | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding   ● 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi-district Litigation   ○ 7 Appeal to District Judge from Mag. Judge   ○ 8 Multi-district Litigation – Direct File

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Removed under 28 U.S.C. §§ 1332, 1441 & 1446.  Plaintiff alleges violation of DC CCPA (D.C. Code §§ 28-3901, et seq.).

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $<br>JURY DEMAND: | Check YES only if demanded in complaint<br>YES ☒    NO ☐ |
|---|---|---|---|
| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐    NO ☒ | If yes, please complete related case form |

DATE: _____10/14/2025_____    SIGNATURE OF ATTORNEY OF RECORD   *[signature]*   (David Horniak)

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

VI.   CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# EXHIBIT 14

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| _____ ) | Case No. 2025-CAB-005515 |
| INTERNATIONAL RIGHTS ADVOCATES ) | |
| ) | (Hon. Leslie A. Meek) |
| Plaintiff, ) | |
| ) | |
| V. ) | |
| ) | |
| ) | |
| TESLA, INC. ) | |
| ) | |
| ) | |
| Defendant. ) | |

PLEASE TAKE NOTICE that Defendant Tesla, Inc. has filed in the United States District Court for the District of Columbia a Notice of Removal to cause removal of the above-captioned action from the Superior Court of the District of Columbia, Civil Division, to the United States District Court for the District of Columbia. A true and correct copy of the Notice of Removal is attached hereto as Exhibit 1. This notice of filing the Notice of Removal is being filed with the Clerk of the Superior Court of the District of Columbia, Civil Division, to thereby effect removal of the case to the United States District Court for the District of Columbia, and the Superior Court of the District of Columbia, shall proceed no further in this case, unless the case is remanded.

Dated: October 14, 2025                    Respectfully submitted,

By: _/s/ David Horniak_
Mary Gately (# 419151)
David Horniak (# 998649)
**DLA PIPER LLP (US)**
500 8th Street, N.W.

Washington, DC 20004
(202) 799-4361
mary.gately@us.dlapiper.com
david.horniak@us.dlapiper.com

*Counsel for Defendant Tesla, Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

    I hereby certify on this 14th day of October, 2025, I caused a true and correct copy of the foregoing to be served on counsel of record by filing the document with the Court's eFileDC electronic filing system, which will send notification of the filing to all counsel registered within that system.

<u>*/s/ David Horniak*</u>